

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KINSER CHIU and MACHINE PROJECT, INC.

                  Plaintiffs,

    -against-

ANTHONY LUCAS and PAN AM SYSTEMS, INC.
and PAN AMERICA WORLD AIRWAYS, INC.,

                  Defendants.

              :

              :

              :



**NOTICE OF REMOVAL**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK:

By their respective counsel, defendants Pan Am Systems Inc. and Pan American World

Airways, Inc.[1] (together "Pan Am") and Anthony Lukas[2] ("Lukas"), with full reservation of any

and all defenses, file this Notice of Removal of an action pending in the Supreme Court of the

State of New York, County of New York, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446. In

support of this Notice of Removal, Pan Am states as follows:

---

[1] Plaintiffs misspelled the name of Pan American World Airways, Inc. – it is "American," not "America."

[2] Plaintiffs misspelled Anthony Lukas's name in the complaint (using a "c" instead of a "k"). In the summons, he is referred to as Anthony Lucus. We will refer to him by his correct name. Anthony Lukas is unrepresented at the time.

1.    On or about May 14, 2008, an action was filed in the Supreme Court of the State of New York, County of New York, entitled <u>Kinser Chiu and Machine Project, Inc. v. Anthony Lucas and Pan Am Systems, Inc., and Pan America World Airways, Inc.</u> (the "Action"). Pursuant to Local Civil Rule 81.1(b), attached as Exhibits A through D hereto are copies of the records and proceedings received by Pan Am in the state court action.

2.    This Notice of Removal is timely filed in accordance with 28 U.S.C. § 1446(b), in that it is filed within thirty (30) days of the date of receipt of an initial pleading setting forth the claim for relief, and within one year after the commencement of the action by the plaintiff.  More specifically, at the same time plaintiffs filed their summons and complaint in Supreme Court, New York County, plaintiffs also filed an order to show cause, <u>ex parte</u>, seeking a temporary restraining order ("TRO"), <u>inter alia</u>, which apparently sought, to prevent defendants from interfering with alleged contractual rights during the pendance of this action for breach of contract.  As required by the local rules of the New York County Supreme Court, counsel to plaintiffs', Raymond W.M. Chin. Esq., notified Pan Am late in the day on May 15 that he intended to apply for a TRO at 11:00 a.m. on May 16, 2008.  Pan Am's counsel, Winston & Strawn, LLP, and Anthony Lukas, <u>pro se</u>, appeared on May 16.  The New York County Supreme Court declined to issue a TRO and adjourned plaintiffs' motion to May 20, 2008.[3]  Pan Am's counsel received a copy of the Summons and Complaint on May 16, 2008, but neither Pan Am Systems, Inc., nor Pan American World Airways, Inc. have been served with the summons and complaint in this action.  Upon information and belief, the summons and complaint in this action has not been served on defendant Lukas.

---

[3] Pan Am has not yet received a transcript of the state court hearing held on May 16, 2008, but will file the transcript upon receipt.

3.    The complaint purportedly contains two causes of actions. The first cause of action appears to allege a breach by Pan Am, aided by Lukas, of certain contractual rights held by Machine Project, Inc., a corporation that is wholly owned by one of the defendants, Lukas. (Exhibit B at ¶¶ 5-15.) The second cause of action alleges, among other vague assertions, that defendant Lukas has been improperly representing that he is the sole shareholder of Machine Project, Inc. and that Pan Am and Lukas schemed to "improperly usurp [Chiu and Machine Project, Inc.'s] efforts and good will." (Exhibit B at ¶¶ 16-19.)

4.    As alleged on the face of plaintiffs' complaint, plaintiff Kinser Chiu ("Chiu") is a resident of the State of New Jersey. (Exhibit B at ¶ 1.) Upon information and belief, Chiu is a citizen of New Jersey. Pan Am, however, is not aware of his address.

5.    For the purposes of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), a corporation is deemed to be a citizen of its state of incorporation and of the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1). As further alleged on the face of plaintiffs' complaint, plaintiff Machine Project, Inc. is a citizen of New York with its principal place of business in New York. (Exhibit B at ¶ 2.)

6.    Defendant Pan Am Systems, Inc. is a Florida corporation with its principal place of business in New Hampshire. Pan American World Airways is a Delaware corporation with its principal place of business in New Hampshire.

7.    The citizenship of the remaining defendant, Lukas, should be disregarded because he was fraudulently joined in order to defeat this Court's jurisdiction pursuant to 28 U.S.C. § 1332. In accordance with Local Civil Rule 81.1(a), however Lukas is a citizen and resident of the State of New Jersey. He resides at 125 Buckingham Ave., Trenton, New Jersey, 08618.

3

8.    Fraudulent joinder as to Lukas is readily apparent. Plaintiff improperly included Lukas in this action in order to defeat diversity jurisdiction pursuant to 28 U.S.C. § 1332. It is black letter law that "a plaintiff may not defeat a federal court's diversity jurisdiction and a defendant's right of removal by merely joining as defendants parties with no real connection with the controversy." Pampillonia v. RJR Nabisco, Inc., 138 F.3d 459, 460 (2d Cir. 1998). One way of showing fraudulent joinder is to show by clear and convincing evidence that "there has been outright fraud committed in the plaintiff's pleadings." Id. at 61.

**Plaintiff Submitted Fraudulent Pleadings**

9.    Throughout the complaint, plaintiff falsely alleges that Chiu was either a shareholder of or otherwise controlled plaintiff Machine Project, Inc.  The complaint alleges that "Chiu, at substantial cost and expense . . . formed Machine, under New York law with offices located in New York City." (Exhibit B at ¶ 9). Plaintiffs further allege that "Lucas [sic], for reasons unknown to and unauthorized by Chiu and Machine falsely represented himself to be the sole shareholder and officer of Machine . . ." (Exhibit B at ¶ 12.) Plaintiffs also allege that representatives of Lukas and Pan Am falsely declared that "Chiu was not a principal, shareholder or officer of Machine . . ." (Exhibit B at ¶ 13.), and that Machine Projects, Inc. is sustaining monetary and reputational damage as a result of Pan Am and Lukas. (Exhibit B at ¶15.)

10.    Upon information and belief; however, Chiu does not own any shares of Machine Project, Inc.'s stock, he is not an officer or employee of Machine Project, Inc., nor is he a director of Machine Project., Inc. Defendant Anthony Lukas is the sole shareholder of Machine Project, Inc. (See Exhibit E.) Anthony Lukas was also the incorporator of Machine Project, Inc., (See Exhibit F), and remains its chairman of the board of directors and president. (See Exhibit G.)

4

The only other officer and director of Machine Project, Inc. is Mary Barenborg, Lukas's wife. (See id.) Nowhere in the complaint or in any of the papers filed in state court does plaintiffs' counsel, Raymond W.M. Chin, explain how he can represent a corporation – Machine Project, Inc. – when no shareholder, officer, or director of that corporation has authorized him to act on its behalf.

11.    Despite the fact that plaintiff Chiu sought the extraordinary remedy of a temporary restraining order preventing defendants from representing that he was not a shareholder of Machine Project, Inc., plaintiff Chiu submitted no documentary evidence to establish that he owns an interest in Machine Project, Inc. in support of his Order to Show Cause. (See Exhibit D.) The sole "evidence" submitted by Chiu that he "owns" Machine Project, Ltd. is annexed as Exhibit 4 to plaintiffs' affidavit of Kinser Chiu, submitted in support of plaintiffs' order to show cause seeking a temporary restraining order and preliminary injunction. (See Exhibit D, Chiu affidavit, ¶ 2, Exhibit 4 thereto). That document refers only to Chiu owning part of Machine Ltd., Inc. -- not Machine Project, Inc. Machine Limited, Inc. is a separate and distinct legal entity from Machine Project, Inc.

12.    As set forth above, there is clear and convincing evidence that the plaintiff intentionally and fraudulently joined Lukas with the conscious purpose of defeating diversity jurisdiction. See Pampillonia, 138 F.3d at 460-61. As the sole shareholder of Machine Project, Inc., Lukas cannot be a defendant in an action brought by his company, without his permission, by an attorney who has no authority to represent Machine Project, Inc. Moreover, Lukas has no

claims against Pan Am, either individually or on behalf of his company, Machine Project, Inc. Thus, the citizenship of Lukas should be disregarded for purposes of diversity jurisdiction.[4]

**The Remaining Requirements for Removal Have Been Satisfied**

13.    The amount in controversy exceeds $75,000, exclusive of interest and costs. (See Exhibit B at 6.)

14.    Defendant Lukas consents to removal

15.    After filing this Notice of Removal, Pan Am will promptly serve notice of removal upon plaintiffs, and will file a true and correct copy of the Notice of Removal with the Clerk of the Supreme Court of New York, New York County, where this case was originally filed.

16.    Defendants request a trial by jury.

17.    In light of the foregoing, removal of this case is proper pursuant to 28 U.S.C. § 1441.

18.    This Notice of Removal does not waive any objections Pan Am may have to defects in process or service of process, jurisdiction, venue, or any other defenses.

WHEREFORE, the defendants, Pan Am Systems Inc. and Pan American World Airways, Inc., with the consent of defendant Lukas, prays for removal of the above-captioned

---

[4]    Pan Am also notes that plaintiff Chiu also may be improperly joined. Although usually applied to improperly joined defendants, fraudulent joinder also applies to improperly joined plaintiffs. See In re Rezulin Proudcts Liability Litigation, 168 F. Supp. 2d 136, 147-48 (S.D.N.Y. 2001). Thus, a plaintiff who is not a real party in interest to a litigation is of no consequence to whether or not there is diversity jurisdiction. See Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 193-95 (2d Cir. 2003); Wells Fargo Bank Northwest, N.A. v. TACA International Airlines, S.A., 314 F. Supp. 2d 195, 199 (2d Cir. 2003); Intershoe v. Filanto, S.P.A., 97 F. Supp. 2d 471, 474 (S.D.N.Y. 2000). Chiu is not a signatory to the contract which was allegedly breached, nor does he have the right to assert a claim on behalf of Machine Project, Inc., the entity that did sign the contract. Thus, plaintiff Chiu appears not to be a real party in interest and could also be disregarded for purposes of determining whether or not there is diversity jurisdiction.

and numbered cause from the Supreme Court of New York, New York County, to this

Honorable Court.


Dated: New York, NY
May 19, 2008


                                    Respectfully submitted,

                                    WINSTON & STRAWN LLP

                                    By:
                                       Thomas J. Quigley
                                       tquigley@winston.com
                                       200 Park Avenue
                                       New York, New York 10166-4193
                                       (212) 294-6700
                                       (212) 294-4700 (facsimile)

                                       *Attorney for Pan Am Systems, Inc.
                                       and Pan American World Airways,
                                       Inc.*

7

-and-



Anthony Lukas, Pro Se
Anthony@panamone.com
125 Buckingham Ave.
Trenton, NJ 08618
(609) 218-6056

To:    RAYMOND W.M. CHIN, Esq.
       305 Broadway (Suite 305)
       New York, NY 10007
       *Attorney for Plaintiffs*

       Clerk of the Supreme Court
       of the State of New York
       New York County County
       60 Centre Street
       New York, NY 10007

8

A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No.:

-------------------------------------------------------------------x

KINSER CHIU and MACHINE PROJECT, INC.

Date Purchased:

Plaintiffs,

**SUMMONS**

- against -

ANTHONY LUCUS and PAN AM SYSTEMS, INC.
and PAN AMERICA WORLD AIRWAYS, INC.
Defendant.

The basis for venue:
Subject matter in
New York County:
241 37th St.
New York, N.Y.

-------------------------------------------------------------------x

To the above named Defendant:

YOU ARE HEREBY SUMMONED to answer the complaint in this action
and to serve a copy of your answer, or if the complaint is not served with
summons, to serve a notice of appearance, on this Plaintiff's attorney within 20
days after the service of this summons, exclusive of the day of service (or within
30 days after service is complete if this summons is not personally delivered to
you within the State of New York) and in case of your failure to appear or answer,
judgment will be taken against you by default for the relief demanded herein.

Dated:      New York, New York
            May 14, 2008

Yours, etc.,

RAYMOND W.M. CHIN
Attorney for Plaintiffs
305 Broadway, Suite 305
New York, N.Y. 10007
(212) 406-2240

To:
Defendants' address:
Anthony Lucus
125 Buckingham Ave.
Trenton, N.J. 08618

Pan Am Systems, Inc.
14 Aviation Ave.
Portsmouth, NH 03801

Pan Am World Airways, Inc.
14 Aviation Ave.
Portsmouth, NH 03801

B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No. purchased
2008

KINSER CHIU and MACHINE PROJECT, INC.

Plaintiffs,

VERIFIED
COMPLAINT

-against-

ANTHONY LUCAS and PAN AM SYSTEMS, INC.,
and PAN AMERICA WORLD AIRWAYS, INC.,

Defendants

Plaintiffs, by their attorney RAYMOND W.M. CHIN, Esq., complaining of defendants
set forth and allege:

1] Plaintiff Kinser Chiu also known as King Wah Chiu (herein Chiu") is and at all times
herein mentioned was a resident of the State of New Jersey and maintained a place of business in
the Borough of Manhattan, County and State of New York.

2] Plaintiff Machine Project, Inc., (herein "Machine") is and at all times herein mentioned
was a corporation organized and existing under the laws of the State of New York which
maintains a place of business in the Borough of Manhattan, County and State of New York.

3] Upon information and belief Defendant Anthony Lucas (herein "Lucas") is and at all
times herein mentioned was a resident of the State of New Jersey and at the times herein
mentioned maintained a place of business in the Borough of Manhattan, County and State of
New York.

4] Upon information and belief Defendant Pan Am Systems, Inc. is a Delaware
corporation which maintains offices in the state of New Hampshire which does business in the

1

State of New York and is an agent or affiliate or subsidiary of Defendant Pan American World Airways, Inc. Both of said defendants are herein referred to collectively as "Pan Am".

## AS AN FOR A FIRST CAUSE OF ACTION

5] Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 4 hereof as if set forth at length.

6] Sometime prior to September 2005 Lucas formed a Delaware corporation known as Machine Ltd. (herein "ML").

7] In September 2005 ML entered into a "Merchandising License Agreement" (herein "Licensing Agreement") with Pan Am World Airways, Inc. in which inter alia ML was granted the right, subject to stated conditions, to sub-license, manufacture and distribute products bearing trademarks and copyrights owned by Pan Am in certain areas (the sub-licensing, manufacture and marketing of said goods being herein described as the "Project").

8] On or about April 6, 2006 Lucas after representing to Chiu that he was the owner of all of ML's existing shares sold one half of said shares to Chiu on the terms and for the consideration stated in that agreement between Chiu and Lucas, a copy of which is annexed hereto as Exhibit A and its terms and conditions incorporated herein as if set forth at length. Those shares were purchased pursuant to an agreement between Chiu and Lucas to obtain Chiu's agreement to perform services and provide financing to enable Machine to carry out the Project.

9] Thereafter and in reliance upon the agreement with Lucas referred to above, Chiu, at substantial cost and expense, commenced work on the Project and formed Machine, under New

2

York law with offices located in New York City, to carry out the Project.

10] Pan Am recognized Machine's organization and position as successor to ML under the Licensing Agreement in an amendment to that agreement dated June 19, 2006, a copy of which is annexed as Exhibit B and in a subsequent "Merchandising Licensing Agreement" which superceded the earlier licensing agreement. A copy of the later agreement, dated January 1, 2007 and executed April 20, 2007 between Pan Am and Machine, is annexed as Exhibit C.

11] In reliance upon the Merchandise Licensing Agreement and other communications between Machine, Lucas and representatives of Pan Am, Machine entered into agreements with Vetements, Inc. and others for the production of the merchandise permitted under the Merchandising License Agreement and Chiu commenced the development and marketing of the merchandise throughout the United States and abroad and also advancing the funds and performing the extensive services required to do so, at substantial monetary expense to Chiu.

12] Upon information and belief shortly after Chiu's efforts on behalf of Machine successfully resulted in orders of the licensed merchandise from customers Lucas, for reasons unknown to and unauthorized by Chiu and Machine falsely represented himself to be the sole shareholder and officer of Machine and entered into discussions and negotiations with Pan Am, unknown to Machine and Chiu, for the termination of the Merchandising Licensing Agreement on terms unknown to Plaintiffs.

13] Thereafter in or around March and April 2008 representatives of Lucas and Pan Am advised Machine and Chiu that the Merchandising Licensing Agreement was terminated due to unspecified defaults on the part of Machine and/or Chui and falsely declaring that Chiu was not a

3

principal, shareholder or officer of Machine and purporting to prohibit Chiu from fulfilling the outstanding orders of licensed merchandise he had obtained or distributing the licensed merchandise to fulfill orders of customers which had been successfully solicited by Chiu and Machine.

14] Despite requests therefor representatives of Pan Am and Lucas refused to describe the nature of the claimed defaults or to afford Machine's an opportunity to cure same.

15] By virtue of the improper actions of Lucas and Pan Am, Chiu and Machine have sustained and are continuing to sustain substantial monetary damage as well as damage to their reputations.

## AS AND FOR A SECOND CAUSE OF ACTION

16] Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 4 and 6 through 15 hereof as if set forth at length.

17] Upon information and belief the actions of Defendants were part of a scheme and plan to unlawfully and improperly usurp Plaintiffs' efforts and good will to Defendants' purposes for Defendants' profit.

18] By virtue of the foregoing Defendants' should be enjoined and restrained from further claiming and representing to others that Plaintiffs no longer have the right to manufacture and distribute merchandise pursuant to the licensing agreement.

19] By virtue of the foregoing Defendant Lucas should be enjoined and restrained from further claiming and representing to others that he is the sole shareholder, director or officer of Machine.

4

WHEREFORE Plaintiffs demand judgment as follows:

a} On the first cause of action in the amount of $2, 000,000 each or such other amount as may be found proper, and

b} On the second cause of action restraining defendants and each of them from representing to others that Plaintiff Chiu is not the owner of at least one half the outstanding shares of plaintiff Machine Project, Inc.. and awarding him damages in the amount of $1,000,000:or such other amount as may be found proper, and

i) Declaring the notice of termination published by Pan AM to be null and void,

ii) Enjoining and restraining Defendants and each of them pendente lite and permanently from taking any action to prevent Plaintiff Machine Project, Inc, from fulfilling its rights under the Merchandise Licensing Agreement and from continuing to perform as licensee under the Merchandising Licensing Agreement with Defendant Pan Am except in accordance with said agreement and after giving Plaintiff Machine Project, Inc. due notice of default and the right to cure same in accordance with said agreement. and

iii) Declaring the Plaintiff Chiu the owner of at least one half the outstanding shares of Machine Project, Inc., and

iv) Enjoining Defendants from representing to anyone that Defendant Lucas is the officer, director, representative or principal of Machine Project, Inc.

c} On the third cause of action determining that the minimum sales requirement of Machine Project, Ltd. under the Merchandise Licensing Agreement should be reduced by an amount to be determined based upon Pan Am's misrepresentation of the geographic scope of the areas in which Pan Am had the right to grant Machine Project the right to sub-license,

6

and for such other and further relief as to the Court may seem just and proper, together with the

costs and disbursements of this action.

Dated: New York, New York                    Yours, etc.,
    May ' 2008

                                            RAYMOND W.M. CHIN
TO                                           Attorney for Plaintiffs
ANTHONY LUCAS                                305 Broadway (Suite 305)
125 Buckingham Ave.                          New York, NY 10007
Trenton, NJ 08618

PAN AM WORLD AIRWAYS, INC.
14 Aviation Ave.
Portsmouth, New Hampshire 03801

.

PAN AM SYSTEMS, INC
14 Aviation Ave.
Portsmouth, New Hampshire 03801

## VERIFICATION

STATE OF NEW YORK       )

COUNTY OF NEW YORK     ) ss.:

      KINSER CHIU, being duly sworn, depose and says:

      I have read the foregoing Verified Complaint and know the contents thereof. The same is true to my own knowledge, except as to the matters therein stated to be upon information and belief and as to those matters, I believe them to be true.

_____
KINSER CHIU

      On May  _13_  , 2008 before me personally came Kinser Chiu, to me known and known to me to be the person described in and who executed the foregoing instrument. He duly swore to such instrument before me and duly acknowledged that he executed the same.

_____
NOTARY PUBLIC

**Exhibit A**

**Date:**    April /06/06
**To:**    Kinser Chiu

**Company**:   Machine Limited Inc. – Incorporated in the state of Delaware
239 Chestnut Street
Philadelphia, PA 19106

**Re:** Machine Limited Inc., the holder of the Pan Am master license worldwide, is selling 1,000 shares [one half of existing shares] to Kinser Chiu, for a rate of $1.00 a share, in exchange for a 50% ownership stake in Machine Ltd.

**Kinser:**
This letter of intent sets forth the terms and conditions pursuant to which Anthony Lucas, sole owner and share holder of Machine Limited, Inc. [the "company"] is selling half of the company to Kinser Chui, in exchange for "help" in the development of the Pan Am license.

**1.** In exchange for 50% ownership stake in Machine Ltd., Kinser Chui, accepts and agrees to "help" in the development of licensed product through financial support, production and production management, inventory commitment/ warehousing as well as financially supporting the development of sales.

**2.** Anthony Lucas will be responsible for the development of the design, sales, marketing, public relations, licensee relationship development and management of licensor.

**3.** This letter of intent constitutes a binding commitment by the parties hereto; provided they are intended as an expression of all the terms of the arrangements among the parties with respect to their subject matter, and such provisions supersede any previous agreements and understandings among the parties with respect to their subject matter and cannot be changed or terminated except by writing and signed by all the parties.

**AGREED AND ACCEPTED BY:**

**Kinser Chiu:**_____ **Date:**_April 12 · 2006_

**Anthony Lucas:**_____ **Date:**_April 12 2006_

/

**Exhibit B**

06/23/2006  07:52    6037662894                    GUILFORD TRANSPORT                    PAGE  82
   06/20/2006 19:43 FAX 19786631213        LAW DEPARTMENT                              ☑002
   06/20/2006 17:38 FAX                     LAW DEPARTMENT                              ☑003
   06/20/2006 53:12 FAX 19786631313

## CONTRACT AMENDMENT NO. 1
## TO
## MERCHANDISING LICENSE AGREEMENT

THIS CONTRACT AMENDMENT NO. 1 (the "Amendment") is entered into effective as of this 19th day of June 2006, between PAN AMERICAN WORLD AIRWAYS, INC. (hereafter "PAN AM") and MACHINE PROJECT, INC. (hereafter "MACHINE").

Whereas, PAN AM and MACHINE are parties to the Merchandising License Agreement (the "Agreement") dated September 2, 2005.

Whereas, PAN AM and MACHINE desire to amend the Agreement in order to reflect certain business name and address changes undertaken by MACHINE,

THEREFORE, in consideration of the mutual covenants and conditions in this Amendment and the Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    The page attached to this Amendment as Exhibit A, and incorporated herein by reference, hereby replaces an existing page in the Agreement, in its entirety, as follows:

Existing pages (Remove)                    Replacement Pages (Attached)
        I                                          I

2.    The Agreement, as modified by the express terms of this Amendment, is hereby ratified and affirmed by PAN AM and MACHINE and shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment effective as of the date first above written.

PAN AMERICAN WORLD AIRWAYS, INC.          MACHINE PROJECT, INC.

By: _____               By: _____

Title: So VP                              Title: President

Date: 6/22/06                             Date: 6-20-06

**Exhibit C**

## MERCHANDISING LICENSE AGREEMENT

**THIS AGREEMENT** (the "Agreement") is entered into as of the 1st day of January, 2007 ("Effective Date") by and between **P AN AMERICAN WORLD AIRWAYS, INC.**, a Delaware corporation with offices at 14 Aviation Avenue, Portsmouth, NH 03801 ("LICENSOR") and **MACHINE PROJECT, INC.**, a New York corporation with offices at 241 37th Street, Seventh Floor, New York, New York 10018 ("LICENSEE").

### W I T N E S S E T H:

**WHEREAS**, LICENSOR and Machine Ltd., which is a predecessor company of LICENSEE, entered a Merchandising License Agreement with an effective date of September 2, 2005 that was amended on June 22, 2006 to replace Machine Ltd. With LICENSEE, and LICENSOR and LICENSEE now desire to terminate that agreement in its entirety and to enter this Agreement;

**WHEREAS**, LICENSOR has certain rights in the Trademarks (as defined in Section 1.S, below;

**WHEREAS**, LICENSOR is willing to grant to LICENSEE the right to use and to authorize others to use the Trademarks;

**WHEREAS**, LICENSEE has represented that it desires and has the ability to manufacture, market, distribute and promote, and to cause others to manufacture, market, distribute and promote, Licensed Products (as defined in Section 1.F, below) in the Territory (as defined in Section 1.R, below);

**WHEREAS**, LICENSOR desires to grant to LICENSEE the right to manufacture, market, distribute and promote Licensed Products in the Territory; and

**WHEREAS**, both LICENSEE and LICENSOR are in agreement with respect to the terms a nd c onditions up on w hich LICENSEE s hall ha ve s uch r ights a s m ore fully provided below.

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the receipt and sufficiency of which are acknowledged, the parties, each intending to be legally bound hereby, do promise and agree as follows.

1.    **DEFINITIONS:** In addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below when used in this Agreement:

   A.    "Artworks" shall mean the works of art identified in Schedule C to this Agreement, as such exhibit may be amended from time to time upon LICENSEE's request to add new works of art, but subject to LICENSOR's approval of such proposed works of art for consistency with the core values associated with the Trademarks.

1

**B.**    "Asia" shall mean that list of countries listed under the heading "Asia" in Schedule D, as such list may be amended from time to time pursuant to this Agreement.

**C.**    "Combined Online Revenues" shall mean the total of Online Revenues and LICENSOR Revenues.

**D.**    "First Renewal Term" shall have the meaning ascribed in Section 4.A.

**E.**    "Initial Term" shall have the meaning ascribed in Section 4.A.

**F.**    "Licensed Products" shall mean Merchandising Products on or in connection with which one or more of the Trademarks is used or appears.

**G.**    "LICENSEE Gross Revenues" shall mean the total of Online Revenues, Wholesale Revenues and Sublicensee Revenues.

**H.**    "LICENSOR Revenues" shall mean LICENSOR's gross revenues from retail sale of Licensed Products via an interactive internet website, less only credits granted to customers of LICENSOR for returns or allowances.

**I.**    "Merchandising Products" shall mean those products listed in Exhibit B to this Agreement, as such exhibit may be amended from time to time upon LICENSEE's request but subject to LICENSOR's approval in its sole discretion.

**J.**    "Minimum Performance Requirement" shall mean LICENSEE Gross Revenues of at least one million five hundred thousand U.S. dollars ($1,500,000.00) for each Royalty Year during the Initial Term, two million U.S. dollars ($2,000,000.00) per Royalty Year during the First Renewal Term, and two million five hundred thousand U.S. dollars ($2,500,000.00) per Royalty Year during the Second Renewal Term.

**K.**    "Online Revenues" shall mean LICENSEE's gross revenues from retail sale of Licensed Products via an interactive internet website, less only credits granted to customers of LICENSEE for returns or allowances.

**L.**    "Renewal Term" shall have the meaning ascribed in Section 4.A.

**M.**    "Royalty" shall mean any and all payments payable to LICENSOR by LICENSEE pursuant to this Agreement.

**N.**    "Royalty Year" shall mean a one-year period commencing on January 1 of a given year.

**O.**    "Second Renewal Term" shall have the meaning ascribed in Section 4.A.

**P.**    "Sublicensee Revenues" shall mean total gross revenues of all Sublicensees from wholesale sale of Licensed Products, less only credits granted to customers of such Sublicensees for returns or allowances.

**Q.** "Term" shall mean the Initial Term and any Renewal Terms.

**R.** "Territory" shall mean all jurisdictions listed in Exhibit D to this Agreement, as such Schedule may be amended from time to time pursuant to Section 3.

**S.** "Trademarks" shall mean the trademarks/service marks PAN AM, the PAN AM AND GLOBE design, PAN AMERICAN WORLD AIRWAYS and the PAA AND WING design, in each case only in the particular logo forms and stylizations depicted in Exhibit A to this Agreement.

**T.** "Wholesale Revenues" shall mean Licensee's gross revenues from wholesale sale (the amount billed to customers) of Licensed Products, less discounts and allowances actually attributable to the Licensed Products as shown on an invoice and, further, less any bona fide returns (net of all returns actually made or allowed as supported by credit memoranda actually issued to customers). All taxes shall be Licensee's responsibility. No other costs incurred in the manufacturing, selling, advertising and/or distribution of the Licensed Products shall be deducted from the Wholesale Revenues nor shall any deduction be allowed for any uncollectible amounts or allowances.

## 2.    LICENSE GRANT/LIMITATIONS ON LICENSE

**A.** Subject to the limitations provided in this Agreement, LICENSOR hereby grants to LICENSEE during the Term:

  i) the exclusive, sublicensable right (subject to the limits on exclusivity and sublicensing provided herein) to use the Trademarks in the Territory on Merchandising Products and in connection with the sale, distribution, advertising and promotion of Merchandising Products in the Territory;

  ii) the non-exclusive and non-sublicensable right to use the Trademarks and the PAN AM ONE.COM mark in the Territory in connection with retail sales services that are rendered by means of an interactive internet website, provided that the only products sold at such interactive internet website or through such online retail sales services shall be Licensed Products; and

  iii) the exclusive and non-sublicensable right to use the panamone.com internet domain name.

**B.** License Restrictions

  i) LICENSEE specifically acknowledges and agrees that nothing in this Agreement authorizes LICENSEE to use the Trademarks or PAN AM ONE.COM mark in connection with retail sales services other than through the interactive internet website specifically allowed in Section 2.A.ii of this Agreement or with the express written consent of Licensor, which consent may be withheld for any reasonable reason. LICENSEE acknowledges that its failure to adhere to the requirement of this paragraph with respect to any

3

Merchandising Sublicense shall constitute a material breach of this Agreement.

ii) LICENSEE's right to sublicense as provided in Section 2.A.i of this Agreement is subject to LICENSEE's provision of reasonable notice to LICENSOR of LICENSEE's intent to appoint a sublicensee ("Sublicensee"), and LICENSOR's advance written consent in its sole discretion to the granting of a sublicense to the proposed Sublicensee. Each of LICENSEE's agreements with Sublicensees ("Merchandising Sublicenses") shall be in the form of agreement to be prepared and provided by LICENSOR (the "Form Merchandising Sublicense"), shall name LICENSOR as an intended third party beneficiary, and shall be subject to the express advance written approval of LICENSOR, which approval may be withheld by LICENSOR for any reasonable reason. Any deviations from the Form Merchandising Sublicense shall be subject to approval of LICENSOR in its sole discretion. Moreover, Each Merchandising Sublicense shall by its own terms (i) set a royalty rate of at least six percent (6%) of Sublicensee Revenues; (ii) provide that LICENSOR, up on t ermination o f t his Ag reement, s hall ha ve t he o ption o f either terminating such Merchandising Sublicense or assuming it from LICENSEE; a nd (iii) s hall c ontain p rovisions t o e nsure t hat t he qu ality o f Licensed Products meets the Quality Standard. All terms of each Merchandising Sublicense (including without limitation the scope of licenses granted therein) shall be consistent with and shall not exceed the scope of this Agreement. LICENSEE acknowledges that its failure to adhere to the requirement of this paragraph with respect to any Merchandising Sublicense shall constitute a material breach of this Agreement.

iii) The rights granted to LICENSEE by LICENSOR in Section 2.A.i of this Agreement shall be exclusive throughout the world; provided, however, that (i) exclusivity shall not apply to those countries that now are members of, or that in the future become members of, the European Union, (ii) the exclusivity shall be subject to rights in the Trademarks granted prior to the Effective Date by LICENSOR or its predecessors to third parties, including without limitation the right granted to Dragon Models to use the PAN AM mark and PAN AM GLOBE logo on or in connection with 1:400 scale models of aircraft types operated by LICENSOR (or its predecessor) in its fleet, including Boeing B747 and Boeing B737 aircraft; and (iii) LICENSOR reserves to itself the right to use the Trademarks in the Territory on products other than Merchandising Products and in connection with the sale, distribution, advertising and promotion (but not the manufacture of Merchandising Products) of those products and Merchandising Products in the Territory, provided; however, that any sales of Merchandising Products by LICENSOR shall not be at a price lower than that charged by LICENSEE or Sublicensees, except for sales to LICENSOR's employees.

iv) Before entering any agreement with a manufacturer, distributor or retail outlet for t he m anufacture, s ale o r dis tribution o f Licensed P roducts, LICENSEE

4

shall obtain LICENSOR's advance written approval of such manufacturer, distributor or retail outlet. LICENSOR's right of approval or disapproval shall be in its reasonable and timely discretion.

v) LICENSEE specifically acknowledges and agrees that its exercise in any manner of any of the rights granted in Section 2.A.i or Section 2.A.ii in any jurisdiction that is not in the Territory shall be deemed a material breach of this Agreement.

**C.**    All LICENSOR's rights in the Trademarks and the PAN AM ONE.COM mark are reserved to LICENSOR unless specifically licensed to LICENSEE herein.

## 3.    AMENDMENT OF TERRITORY

**A.**    The scope of the Territory may be amended from time to time upon LICENSEE's request, subject to LICENSOR's approval in its reasonable discretion as provided herein. At least eight (8) weeks before LICENSEE commences (or, with respect to a Merchandising Sublicense, before a Sublicensee commences) the manufacture, distribution, promotion or sale of one or more Licensed Product in a country that is not at that time listed in Exhibit D (a "Proposed Jurisdiction"), LICENSEE shall provide LICENSOR with written notice of its desire to expand the Territory to include such Proposed Jurisdiction. Within four (4) weeks of its receipt of such notification from LICENSEE, LICENSOR shall inform LICENSEE of whether or not it approves of expansion of the Territory to include such Proposed Jurisdiction. LICENSOR's approval of such expansion shall be in its reasonable discretion, and reasonable grounds for disapproval shall include without limitation the determination that LICENSEE's manufacture, distribution, promotion or sale of Licensed Products in such Proposed Jurisdiction would create an undue risk of violation of the intellectual property rights of a third party or of damage to LICENSOR's rights in the Trademarks. In the event LICENSOR denies expansion of the Territory to include a Proposed Jurisdiction, LICENSOR shall make reasonable efforts to provide LICENSEE with an alternative mark or marks to use in such jurisdiction.

## 4.    TERM/TERMINATION/MINIMUM PERFORMANCE REQUIREMENT

**A.**    This Agreement and the provisions hereof, except as otherwise provided herein, shall be in full force and effect commencing on the Effective Date and shall continue through December 31, 2011 (the "Initial Term"). Subject to its satisfaction of the Minimum Performance Requirement, LICENSEE shall have the right to extend this Agreement for two (2) additional periods of five (5) years each (each such five (5) year period being a "Renewal Period"), with the "First Renewal Period" ending December 31, 2016, and the "Second Renewal Period" ending December 31, 2021. In order to exercise its renewal options, LICENSEE shall give LICENSOR at least twelve months written notice prior to the conclusion of the Initial Term or applicable Renewal Period.

**B.**    In the event LICENSEE has not satisfied the Minimum Performance Requirement during any Royalty Year during the Initial Term or applicable Renewal Period:

i) LICENSEE's right to extend this Agreement shall be subject to LICENSOR's approval in its sole discretion; or

5



ii) LICENSOR shall have the option (i) to collect from LICENSEE the Royalty that would have been due from LICENSEE if the Minimum Performance Requirement for such Royalty Year had been satisfied (with a credit for Royalty payments already made on LICENSEE Gross Revenues for that Royalty Year), or (ii) to terminate this Agreement and all licenses granted herein upon thirty (30) days written notice to LICENSEE.

C.      In the event LICENSEE fails to satisfy the Minimum Performance Requirement during any Royalty Year or to timely exercise its option to renew this Agreement pursuant to Section 4.A, LICENSOR thereafter shall be free to negotiate with any other party in respect of the rights granted by LICENSOR to LICENSEE in this Agreement.

D.      This Agreement may be terminated by either party upon thirty (30) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the thirty (30) days period, the breaching party fails to cure such breach.

E.      Effects of Termination

i) Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all its and Sublicensees' inventory of Licensed Products as well as all work in progress (the "Inventory").

ii) Upon the expiration or termination of this Agreement, all of the rights of LICENSEE under this Agreement shall terminate and immediately revert to LICENSOR, LICENSEE shall immediately cause all Sublicensees to discontinue all use of the Trademarks (unless the applicable Merchandising Sublicense is assumed by LICENSOR pursuant to Section 2.B.ii), and LICENSEE will have one year to sell all Inventory (and, except with respect to those Merchandising Sublicenses assumed by LICENSOR pursuant to Section 2. B.ii, s hall c ause a ll S ublicensees t o d o t he s ame), all a t no c ost whatsoever to LICENSOR.  If in the case another LICENSEE is obtained, they may purchase the inventory at cost plus 20%.

iii) Immediately upon expiration or termination of this Agreement, LICENSEE shall inactivate the internet web site located at www.panamone.com, cease all commercial activity and all use of such domain name and all use of the Trademarks and the PAN AM ONE.COM mark at such site, and shall assign to LICENSOR the domain name registration for the www.panamone.com internet domain name.

iv) The agreement between LICENSOR and Machine, Ltd, a predecessor company of LICENSEE, effective as of September 2, 2005 is hereby terminated by mutual agreement of LICENSOR and LICENSEE.

6

## 5.  DUTIES AND OBLIGATIONS OF LICENSEE

**A.**    LICENSEE shall, subject to LICENSOR's advance review and approval, develop a cohesive imaging and licensing program that focuses upon LICENSOR's core brand values as contemplated by this Agreement.

**B.**    LICENSEE shall develop a graphic ID standards manual for LICENSOR's review and approval in its discretion (the "Usage Guidelines"). The Usage Guidelines shall delineate certain standards for use of the Trademarks. LICENSEE shall adhere to such Usage Guidelines and shall cause all Sublicensees to do the same.

**C.**    Subject to the conditions herein specified, LICENSEE shall use its best efforts consistent with sound business practices during the Term to find and conclude business arrangements with Sublicensees that are advantageous to LICENSOR and, after entry of Merchandising Sublicenses memorializing such arrangements, to reasonably service such arrangements and agreements during their term and the term hereof, including, but not limited to, providing guidance and education to Sublicensees pertaining to the imaging and licensing program, monitoring the Sublicensees for their adherence to the Quality Standards (as defined in Section 8.C), LICENSEE shall provide yearly reports to LICENSOR detailing the status of all sublicensing projects and opportunities, and all of LICENSEE's manufacturing, sales, distribution and promotion activities concerning Licensed Products.

**D.**    LICENSEE shall engage in such other activities as the parties may mutually agree and, in general use its best efforts consistent with sound business practices to maximize revenue generated from the use of the rights granted hereunder and to enhance the value and reputation of the Trademarks.

**E.**    LICENSEE shall oversee and be responsible for payments due from Sublicensees under Merchandising Sublicenses, and shall provide quarterly and annual reports to LICENSOR. Such reports shall be certified by an authorized financial officer of LICENSEE or LICENSEE's accountant, and shall include a full and accurate statement showing (i) the number of each type of Licensed Product sold by LICENSEE and Sublicensees, (ii) the revenues derived therefrom, indicating the particular Licensed Product from which the revenues were derived and whether the revenues constitute Online Revenues, Wholesale Revenues or Sublicensee Revenues, and (iii) all such other information and details necessary to compute and verify the accuracy of Royalties. If necessary, LICENSEE shall conduct periodic investigations of Sublicensees' books and records to ensure that all payments have been accurately computed and fully made. The cost of such royalty investigations shall be borne by LICENSEE; provided, however, that any recoveries received as a result of such investigation shall be applied initially against the cost of conducting such investigation and then divided equally between LICENSOR and LICENSEE.

**F.**    It is understood that LICENSOR may have concepts and uses for the Trademarks or Artworks other than for use on or in connection with the Merchandising Products. During the Term, LICENSOR shall not license the Trademarks for use on or in connection with products or services other than the Merchandising Products (with the exception of uses of the Trademarks by LICENSOR or its affiliates or licensees that predate the effective date of this Agreement), either by itself or through an agent, without first offering such opportunity to LICENSEE under the



same terms and conditions as this Agreement. In the event that LICENSEE does not accept such offer in writing within thirty (30) days after notification by LICENSOR, LICENSOR shall be free to commence the commercialization or licensing of the Trademarks other than on or in connection with the Merchandising Products with no obligation to LICENSEE.

G.    LICENSOR recognizes that LICENSEE performs similar services for its other clients and that LICENSEE's retention of LICENSEE is subject to such understanding. Provided, however, that LICENSEE's relationships with its other clients shall not unreasonably interfere with LICENSEE's performance of the terms and conditions of this Agreement.

H.    LICENSEE agrees to sell Licensed Products to LICENSOR in exchange for LICENSOR's payment of a price equal to the Wholesale price for each item less 20% plus reasonable shipping and handling costs if applicable.

I.    LICENSEE agrees that it shall use at least one of the Trademarks on each Merchandising Product on which one or more of the Artworks appears.

J.    LICENSEE shall make available to LICENSOR a link between LICENSOR'S internet website and LICENSEE'S panamone.com internet website (or such other website that LICENSEE develops for the online sale of Merchandise Products) that will enable users of LICENSOR'S internet website to purchase Merchandise Products at retail prices. For any purchases using such link, LICENSEE shall be responsible for shipping the Merchandise Products to the purchasers, and shall pay to LICENSOR the difference between the retail price and the cost of the Merchandise Products. If purchasers that initially purchased Merchandise Products via LICENSOR'S internet website were to purchase additional Merchandise Products in the future via LICENSEE'S internet website, those purchases shall be treated as if they were made via LICENSOR'S internet website, and payment shall be made to LICENSOR in accordance with this paragraph.

K.    LICENSEE acknowledges and agrees that its breach of any of the obligations contained in this Section 5 shall be considered a material breach of this Agreement sufficient to justify termination of this Agreement.

6.    **COMPENSATION**

A.    Wholesale sales by LICENSEE.

i)    Within thirty (30) days following the end of each calendar month following the Effective Date, LICENSEE shall pay to LICENSOR a royalty of six percent (6%) of Wholesale Revenues attributable to Asia, and seven percent (7%) of Wholesale Revenues attributable to countries outside of Asia. In the event that Wholesale Revenues for a particular Royalty Year exceed twenty million U.S. dollars ($20,000,000.00), the parties shall negotiate in good faith to determine a suitable royalty rate in excess of six percent (6%) and seven percent (7%) (for Asia and countries outside Asia, respectively) for Wholesale Revenues that exceed twenty million U.S. dollars ($20,000,000.00.

B.    Online Sales

8



i) Within thirty (30) days following the end of each calendar month following the Effective Date, LICENSEE shall pay to LICENSOR a royalty of (i) six percent (6%) of Online Revenues for the first ten million U.S. dollars ($10,000,000.00) of Combined Online Revenues in each Royalty Year, seven percent (7%) of Online Revenues for the second ten million U.S. dollars of Combined Online Revenues in each Royalty Year, and ten percent (10%) of Online Revenues for the third ten million U.S. dollars ($10,000,000.00) of Combined Online Revenues in each Royalty Year. In the event that Combined Online Revenues for a particular Royalty Year exceed fifty million U.S. dollars ($50,000,000.00), the parties shall negotiate in good faith to determine a suitable royalty rate in excess of ten percent (10%) for Online Revenues that exceed fifty million U.S. dollars ($50,000,000.00).

**C.**   Sales by SUBLICENSEES

i) Within forty-five (45) days following the end of each quarterly period following the Effective Date, LICENSEE will pay to LICENSOR one hundred percent (100%) of the royalty received by LICENSEE at a rate of 6% from Merchandising Sublicenses during such quarter.

**D.**   Miscellaneous

i) All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties.

ii) All fees payable hereunder shall be based upon the HSBC official exchange rate on the date on which such payment is due. If, by any reason of any governmental or fiscal restrictions affecting the convertibility, payment cannot be made in U.S. funds; then LICENSEE shall take such reasonable actions with respect to payment due as LICENSOR may direct.

iii) Any payment not paid by LICENSEE when due for any reason shall accrue interest payable to LICENSOR from the day after payment was due until payment is made, which interest shall be at the rate of one and one half percent (1 ½%) per month or the maximum amount permitted by U.S. law, whichever is greater.

## 7.   <u>AUDIT</u>

**A.**   LICENSOR shall have the right, upon at least ten (10) days written notice and no more than once per calendar year, to inspect or authorize a third party [Big 4 or equal] to inspect LICENSEE's books and records and all other documents and materials in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

**B.**   All books and records relevant to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three years after the date to which they pertain.

**C.** In the event that LICENSOR or LICENSOR's agent makes an investigation of LICENSEE's books and records, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be retained in confidence by LICENSOR and shall not be used by LICENSOR for purposes other than with respect to the subject matter of this Agreement or disclosed to any third party for a period of five (5) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law. It is understood and agreed, however, that such information may be used in any proceeding based on LICENSEE's failure to pay its Royalty obligation, or its failure otherwise to meet any of its obligations under this Agreement.

## 8. QUALITY CONTROL & SAMPLES

**A.** The rights granted hereunder are conditioned upon LICENSEE's full and complete compliance with the marking provisions of the trademark and copyright laws of the United States and other countries in the Territory, and LICENSEE's causing Sublicensees to do the same.

**B.** All Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices as required under law or by LICENSOR.

**C.** The Licensed Products, whether manufactured, distributed or sold by LICENSEE or a Sublicensee, shall be of a high quality in design, materials and workmanship and of a level of quality that is reasonably acceptable to LICENSOR and at least equal to the level of quality historically associated with the Trademarks (the "Quality Standard"). For the avoidance of doubt, the failure of Licensed Products to attain the Quality Standard shall be considered a material breach of this Agreement or a Merchandising Sublicense, and shall be considered sufficient grounds for termination thereof.

**D.** At least two (2) weeks before LICENSEE or a Sublicensee begins the manufacture of a New Licensed Product or any alteration of a previously approved Licensed Product, LICENSEE shall submit to LICENSOR for approval one (1) prototype of such New Licensed Product, including all packaging, advertising and promotional materials. Moreover, at least two (2) weeks before LICENSEE or a Sublicensee first ships a New Licensed Product for sale or distribution, LICENSEE shall submit to LICENSOR for approval two (2) samples of such New Licensed Product and all associated packaging, advertising and promotional materials. In each case, LICENSOR shall have the right to deny approval of the New Licensed Product (i) in its reasonable discretion, (ii) if such New Licensed Product fails to be in compliance with the terms of this Agreement, (iii) if such New Licensed Product fails to meet the Quality Standard, or (iv) if LICENSOR determines in its reasonable discretion that such New Licensed Product is inconsistent with or damaging to the core attributes associated with the Trademarks. "New Licensed Product" shall mean a Licensed Product of a genus, model or version that has not previously been submitted to LICENSOR for approval under this subsection 8.D.

10

9.    **NOTICE**

A.    Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at its above stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B.    Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

10.   **TRADEMARK OWNERSHIP AND REGISTRATION**

A.    LICENSOR shall determine in its sole discretion whether, when and where to file for trademark registration, or to maintain existing trademark registrations, for the Trademarks.

B.    In the event that LICENSOR elects to file a new application in a country located in the Territory for registration of any of the Trademarks for use on or in connection with Licensed Products, LICENSEE shall reimburse LICENSOR for all costs, expenses and legal fees associated with prosecuting and maintaining such application(s) for trademark registration and any resulting registration(s). Such applications and registrations shall be owned by LICENSOR and LICENSOR shall control and have the right to direct such prosecution and maintenance in its sole discretion.

C.    The parties agree to execute any documents reasonably requested by the other party to effect any of the provisions of this Section.

D.    LICENSEE acknowledges LICENSOR's exclusive ownership of the Trademarks and all associated goodwill. LICENSEE agrees that its and each Sublicensee's use of the Trademarks inures to the benefit of LICENSOR and that neither LICENSEE nor any Sublicensee shall acquire any rights in the Trademarks or the good will associated therewith. LICENSEE further agrees that it will not apply in any jurisdiction for trademark registration of any of the Trademarks or any confusingly similar alternatives, and that it will not oppose, petition to cancel or otherwise contest LICENSOR's applications or registrations for the Trademarks or similar marks.

11.   **INFRINGEMENTS**

A.    LICENSOR shall have the right, but not the obligation, at its own cost and expense, to institute and prosecute lawsuits or other enforcement efforts such as arbitrations, administrative proceedings and demand letters ("Actions") against third persons for infringement or other violation of the rights licensed in this Agreement or the Merchandising Sublicenses. Should LICENSEE learn of any potential or actual infringement or other violation of the rights licensed under this Agreement or any of the Merchandising Sublicenses, LICENSEE shall promptly notify LICENSOR. If LICENSEE should desire that LICENSOR institute an Action, LICENSEE shall make a written request to LICENSOR to do so. If LICENSOR does not institute an Action within ninety (90) days after LICENSEE has made a written request that LICENSOR do so, LICENSEE may institute and prosecute such Action on its own behalf with LICENSOR's advance written consent, which LICENSOR shall not unreasonably deny.

11

**B.**    Any Action shall be prosecuted solely at the cost and expense of the party bringing the Action. With respect to any Action brought by LICENSOR, all sums recovered, whether by judgment, settlement or otherwise, shall belong exclusively and entirely to LICENSOR. In the event LICENSEE brings an Action, all sums recovered, whether by judgment, settlement or otherwise, in excess of the amount of reasonable attorneys' fees actually paid to counsel for the party bringing the Action and other out of pocket expenses incurred in such Action, shall be divided equally between LICENSOR and LICENSEE.

**C.**    Upon the reasonable request of the party bringing the Action, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such Action, including consenting to joinder in the Action. The party bringing suit shall reimburse the other party for the reasonable expenses incurred as a result of such cooperation.

## 12.    REPRESENTATIONS AND WARRANTIES

**A.**    Notwithstanding anything to the contrary herein, LICENSOR makes no representations or warranties concerning its ownership of copyrights or any other rights in the Artworks, nor with respect to the Trademarks, other than that, as of the Effective Date, it owns the trademark registrations listed in Exhibit A to this Agreement. LICENSEE acknowledges that third parties may own rights in or appurtenant to one or more of the Artworks, and that LICENSEE's use of the Artworks is at its own risk. LICENSOR agrees, however, that LICENSOR will not challenge LICENSEE on the ground that LICENSEE's reproduction of Artworks on Licensed Products or in connection with the advertising or promotion of Licensed Products, or LICENSEE's distribution of Licensed Products on which Artworks appear, infringes any copyrights that LICENSOR might own in the Artworks.

**B.**    Each of the parties represents and warrants to the other that it has the legal right, authority and capacity to enter into this Agreement and to make the covenants made in this Agreement, and that there is no other agreement, and that it will not during the term of this Agreement enter any other agreement, in conflict herewith.

## 13.    INDEMNITY

LICENSEE agrees to defend, hold harmless and indemnify LICENSOR, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) that arise from claims of third parties against LICENSOR that relate to either LICENSEE's or a Sublicensees' use of the Trademarks, Artworks or that relate to Licensed Products or LICENSEE's actions within the scope of this Agreement or a Sublicensee's actions within the scope of a Merchandising Sublicense. LICENSEE shall ensure that each Merchandising Sublicense shall similarly provide indemnification to LICENSOR.

## 14.    INSURANCE

LICENSEE shall, throughout the Term of the Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business in New York, standard Product Liability Insurance naming LICENSOR as an additional named insured. Such policy shall provide coverage in the amount of $5 million, and protection against any and all

claims, demands and causes of action covered by the indemnification provisions of this Agreement, including without limitation those arising out of any breach by LICENSEE of the terms of this Agreement, claims of infringement or other violations concerning the Trademarks or Artworks, defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The policy shall obligate the insurer to provide notice to LICENSOR by Registered or Certified Mail, return receipt requested, within ten (10) days in the event of any modification, cancellation or termination thereof. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within thirty (30) days after execution of this Agreement. Each of the Merchandising Sublicenses shall contain similar insurance provisions applicable to each Sublicensee, with appropriate coverage limits as approved in advance by LICENSOR.

## 15.    **FORCE MAJEURE**

It is understood and agreed that in the event of an act of the government, or war conditions, or fire, flood or labor trouble in the factory of LICENSEE or a Sublicensee, or in the factory of those manufacturing parts necessary for the manufacture of the Licensed Products, prevent the performance by LICENSEE of the provisions of this Agreement, then such nonperformance by LICENSEE shall not be considered as grounds for breach of this Agreement and such nonperformance shall be excused while the conditions herein prevail and for two (2) months thereafter.

## 16.    **JURISDICTION & DISPUTES**

A.    This Agreement shall be governed in accordance with the laws of the State of Massachusetts.

B.    All disputes under this Agreement shall be resolved by the courts located in the State of Massachusetts located in Boston, Massachusetts, including the United States District Court for the District of Massachusetts, and each of the parties consents to the jurisdiction of such courts, agrees to accept service of process by mail, and hereby waives any jurisdictional or venue defenses otherwise available to it.

## 17.    **ASSIGNMENT/AGREEMENT BINDING ON SUCCESSORS**

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, permitted successors and permitted assigns. Any assignment of this Agreement by LICENSEE shall be subject to the express written approval of LICENSOR, which approval shall not unreasonably be withheld. For the purposes of this Section, a change of control of LICENSEE shall be deemed an assignment requiring LICENSOR's express written approval. Any assignment by LICENSEE in violation of this provision shall be considered null and void from its inception.

## 18.    **WAIVER**

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

13

19.    **SEVERABILITY**

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

20.    **NO JOINT VENTURE**

Nothing contained herein shall constitute this arrangement to be an employment, a joint venture or a partnership, or to create an agency relationship.

21.    **INTEGRATION**

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties (including, without limitation, the Merchandising License Agreement with an effective date of September 2, 2005 between LICENSOR and LICENSEE's predecessor, Machine Ltd.), including any option agreements that may have been entered into between the parties, and is intended as a final expression of their agreement concerning the subject matter hereof. This Agreement shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents that may be in conflict with this Agreement.

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have executed this Merchandising License Agreement on the date indicated below, effective as of the Effective Date.

PAN AMERICAN WORLD AIRWAYS, INC.        MACHINE PROJECT, INC.

By: _____            By: _____

Title: _Senior VP General Counsel_     Title: ___4.___

Date: _4.20.07___                       Date: _4.20.07___

Date: _____          Date: _____

Approved as to termination of agreement with Machine, Ltd.

14

## EXHIBIT A

<u>Trademarks</u>:
**[To be supplemented with schedule of registrations]**







[substitute PAA AND WING logo (logo to side)]

15

## EXHIBIT B

Merchandising Products:

Luggage, travel bags, tote bags

Accessories, namely umbrellas, hats, belts, sun glasses

Apparel

Footwear

Watches, jewelry

Model airplanes (excluding 1:400 scale model aircraft)

Stationery, calendars, note cards, posters, prints

Memorabilia, namely, art plates, ornaments, toys, coffee mugs, towels Travel accessories, namely, locks, toiletries

Home and housewares including bedding and bathroom goods

Mineral water and alcoholic/non-alcoholic drinks

Board games, card games, video and electronic games

## EXHIBIT C

Artworks:



## EXHIBIT D

Territories:

Asia: Means countries including China, Hong Kong, Macau, India, Malaysia, Thailand, Vietnam, Korea, Japan, Singapore, etc. within the Eurasian landmass next to Europe – lying approximately along Urals, the Urals River, the Caspian Sea, The Caucasus, The Black Sea The Bosporus and the Dardanelles straits, and the Aegean Sea, with the Suez Canal as the west boundary, the Bering Strait as the northeast boundary Golf of Aden, the Arabian Sea, and the Bay of Bengal as the South Boundary, the South China Sea, Yellow Sea, The Sea of Japan, The Sea of Okhotsk, and the Bering Sea as the east boundary and the Artic Ocean as the Northern boundary

The Rest of the world besides Germany and the EU.

ANNARBOR 8663405

C

**RAYMOND W. M. CHIN**

*Attorney At Law*
*305 Broadway, Suite 305*
*New York, N.Y. 10007*
*Tel.: (212) 406-2240*
*Fax: (212) 406-2271*

ADMITTED IN NY & NJ

May 15, 2008

By Fax: (603) 766-2109
Anthony Lucas
125 Buckingham Avenue
Trenton, N.J. 08618

By Fax: (603) 766-2109
Pan Am Systems, Inc.
14 Aviation Avenue
Portsmouth, NH 03801

By Fax: (603) 766-2109
Pan Am World Airways, Inc.
14 Aviation Avenue
Portsmouth, NH 03801

Re: Kinser Chiu and Machine Project, Inc. vs. Anthony Lucas and Pan Am Systems, Inc., et. al.

Gentlemen:

This office represents Kinser Chiu and Machine Projects, Inc. in their actions against you. Pursuant to the New York State Supreme Court rules, this is notice as required, that we are requesting a temporary restraining order be issued in this matter which application will be heard on May 16, 2008 at 11:00 a.m. at Room 148 at the Courthouse located at 60 Centre Street, New York, N.Y.

Very truly yours,

RAYMOND W. M. CHIN

RWMC/jc

D

ᐧ    ᐧ  ᴦ

At a Term for Motions of the Supreme
Court of the State of New York held in and
for the Count of New York, at the County
Courthouse, 60 Centre Street, New York,
New York on the       day of May 2008

P R E S E N T:

_____ J SC

-----------------------------------------------------------------------x

KINSER CHIU and MACHINE PROJECT, INC.,            <u>ORDER TO SHOW CAUSE</u>

                                Plaintiffs,

                                                   INDEX NO. 601457/08
                   -against-

ANTHONY LUCAS and PAN AM SYSTEMS, INC. and
PAN AMERICAN WORLD AIRWAYS, INC.,

                                Defendants.
-----------------------------------------------------------------------x

UPON READING AND FILING the summons, complaint, the affidavit of KINSER

CHIU, sworn to May 12, 2008 and the affirmation of RAYMOND W.M. CHIN, Esq., affirmed

the 12th day of May, 2008 and upon all the pleadings and proceedings heretofore had herein and

sufficient cause appearing therefor

LET THE PARTIES NAMED BELOW show cause before a Special Term of this Court

to be held in Room      of the County Courthouse, at 60 Centre Street, in the Borough of

Manhattan, County, City and State of New York to be held on the      day of May, 2008 at 10:30

o'clock on the forenoon of that day or as soon thereafter as counsel can be heard why an order

should not be entered:

1] Restraining defendants from interfering with the performance of the licensing

agreement between Plaintiff Machine Project, Inc. and Defendants Pan Am World Airways, Inc.

and Pan Am Systems, Inc. dated January 1, 2007 and executed April 20, 2007 or with the

fulfillment of orders received for the merchandise licensed thereunder without advising Plaintiff Machine Project, Inc. of the nature of any claimed default by it under the licensing agreement and permitting the cure of any such default, and

2] Restraining defendants from representing to others that Defendant Lucas is the sole officer and shareholder of Machine Project, Inc. and that Plaintiff Chiu is not an officer and shareholder thereof

Together with such other and further relief as to the Court may seem just and proper.

SUFFICIENT REASON APPEARING THEREFOR it is

ORDERED that pending the hearing of this motion defendants be and they hereby are restrained and enjoined from interfering with the performance of the licensing agreement between Plaintiff Machine Project, Inc. and Defendants Pan Am World Airways, Inc. and Pan Am Systems, Inc. dated January 1, 2007 and executed April 20, 2007 or with the fulfillment of orders received for the merchandise licensed thereunder without advising Plaintiff Machine Project, Inc. of the nature of any claimed default by it under the licensing agreement and permitting the cure of any such default, and from representing to others that Defendant Lucas is the sole officer and shareholder of Machine Project, Inc. and that Plaintiff Chiu is not an officer and shareholder thereof

SUFFICIENT REASON APPEARING THEREFOR let service of this order and a copy of the papers upon which it is based upon the parties named below by certified mail, return receipt requested on before May    , 2008 be deemed sufficient.

PARTIES TO BE SERVED
ANTHONY LUCAS
125 Buckingham Ave.
Trenton, NJ 08618

E N T E R

_____
JSC

PAN AM SYSTEMS, INC.
14 Aviation Ave.
Portsmouth, NH 03801

PAN AM WORLD AIRWAYS, INC.
14 Aviation Ave.
Portsmouth, NH 03801

C:\Documents and Settings\paperno\My Documents\kinserorder1.wpd

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No. Purchased
2008

KINSER CHIU and MACHINE PROJECT, INC.

Plaintiffs,

AFFIDAVIT IN
SUPPORT OF
ORDER TO SHOW
CAUSE

-against-

ANTHONY LUCAS and PAN AM SYSTEMS, INC.,

Defendants

State of New York    }
County of New York } ss.:

Kinser Chiu being duly sworn, deposes and says:

1. I am a plaintiff in this action and own one half the shares of the other plaintiff. I submit this affidavit in support of plaintiffs' application for a temporary injunction restraining defendants from unlawfully interfering with a contract between the corporate plaintiff (Machine Project, Inc., herein "Machine") and the corporate defendants (Pan Am World Airways, Inc., and Pan Am Systems, Inc., herein jointly referred to as "Pan Am") in which Pan Am licensed Machine to manufacture and distribute in certain areas certain merchandise bearing Pan Am's logo. I am personally familiar with the facts and circumstances herein set forth.

2. As set forth in the verified complaint in 2005 Pan Am licensed a Delaware corporation formed by Defendant Lucas, Machine, Ltd., Inc. to sub-license others to manufacture and market the products described in the agreement. (See Exhibit 1)  Because of its lack of finances and knowledge and the inability of Defendant Lucas to successfully market those products,

Defendant Lucas and Plaintiff Chiu entered into an agreement whereby a new corporation (Machine) was formed. Chiu and defendant Lucas were to be equal partners in the new enterprise. Plaintiff Chiu through Vetements, Inc. provide the financing, manufacturing and distributing expertise to enable the sub-licensing, manufacture and sale of the licensed products. The initial licensing agreement with Pan Am was amended and then superceded in 2007 by a substantially similar agreement between Machine and Pan Am wherein Machine Project succeeded Machine Ltd. as the licensee. (Exhibit 2 (a)). Neither Machine nor I had legal counsel during the period preceding and at the time of entry into the agreement. A copy of the 2007 agreement is annexed to the complaint and an additional copy annexed hereto as Exhibit 3. This agreement followed my acquisition of one half the authorized shares of Machine Project with defendant Lucas (the principal of the earlier licensee) owing the other one half. Copies of documents evidencing that ownership by me are annexed as collective Exhibit 4 as is documentation evidencing both Defendants' express acknowledgment of my ownership of those shares, a position later repudiated by both who, apparently simultaneously forgot their earlier writings.

3. Thereafter I devoted my full time and substantial personal resources to promoting this business and obtaining customers for the merchandise. During this period while on a business trip to Asia I undertook on behalf of Machine at my expense I learned that some of the representations made by representatives of Pan Am were false in that it did not own, as it had represented in Exhibit 1 (Para. 2 (A) (i) and ii) the exclusive right to these trademarks in Japan one of the most substantial areas and profitable areas of Asia, to wit, Japan. However by that time I had expended so much time and money promoting this enterprise I continued my efforts.

As this promotion was the sole business of Machine it had no income during this period.. At the same time defendant Lucas complained of his lack of resources and income (See Exhibit 5) and requested financial assistance from me for he claimed he was not earning enough to cover his living expenses.

4. As my efforts were coming into fruition and orders started coming into Machine, we were advised by representatives of Mr. Lucas that he had represented to them that he was the sole shareholder and principal and officer of Machine and that I, on behalf of that corporation, had no authority to continue my merchandising work under the licensing agreement. (See Exhibit 6). Simultaneously I was notified by defendant Pan AM that Machine was in default under the licensing agreement in ways Pan Am refused to specify and that that agreement was no longer in effect. (Exhibit 7) The efforts of myself and my attorney to obtain advise of then nature of the defaults were unsuccessful as was my request for evidence of Mr. Lucas' claimed status as sole shareholder of Machine. My attorney has advised me that in a telephone conversation with a senior officer of Pan Am he was advised that at last one of the claimed defaults was Machine's failure to sell the required per annum minimum dollar required in paragraph 1 (J) of the licensing agreement. However or failure to meet this requirement was due in substantial part to Pan Am's misrepresentation described above and, under the agreement, such failure only gave Pan Am the right not to renew its term (See Para. 4 (B) and 4 (C)of Exhibit 2) and is subject to the provisions of paragraph 4 (D) of the agreement which requires written notice of any default and an opportunity to cure. All this occurred as orders for the hundreds of thousands of dollars of merchandise were being received and goods were being manufactured and shipped to fulfil those orders. For example through my efforts the merchandise was being featured and offered for sale

by prestigious retailers such as Marc Jacobs, Barnes & Noble, Bloomingdales, MGM, Hudson Group, Nordstrom and the souvenir shop of the Smithsonian Air and Space Museum in Washington D.C. and other like places.

5. Simultaneously Pan Am was itself seeking to buy those goods from Vetements, Inc. at deeply discounted prices - prices which would result in substantial losses to Machine and to me, personally for I had personally financed the merchandising operation and spent my full time or many months on this business. For example we were advised that Pan AM would purchase for $150,000 selected merchandise for which orders in excess of one half million dollars had been placed, leaving us with the balance of the merchandise (the least popular items) and an inability to sell same for it bore Pan Am's copyright and trademark. This is patently contrary to the provisions of the agreement with Pan Am (Exhibit 2) which grants to the licensee one year after termination to sell goods produced by the licensee to market those goods. As above noted this agreement was prepared by Pan AM and I am advised that any ambiguities in it should be construed against Pan AM.

6. Upon information and belief these actions of Pan Am were conducted pursuant to a scheme or plan between Defendant Lucas and senior officers of Pan Am to usurp my efforts and the monies I expended in marketing the products for their own purposes.

7. As this is being written additional orders are being received and merchandise manufactured. Unless this is resolved quickly the reputation of myself and Machine Project, Inc. will be irreparably damaged and substantial financial damage done to both.

8. No previous application for this relief has been made.

Wherefore it is requested that an order issue:

1] Restraining defendants from interfering with the performance of the licensing agreement or with the fulfillment of orders for the merchandise received thereunder without advising Machine of the nature of any claimed default by it under the licensing agreement and permitting the cure of any such default, and

2] Restraining defendants from representing to others that Defendant Lucas is the sole officer and shareholder of Machine.

Sworn to before me
May 12, 2008

_____
Kinser Chiu

_Wai Man Chun_
Notary Public

C:\Documents and Settings\paperno\My Documents\kinseroscaff.wpd

**Plaintiff's Exhibit 1**

*ATTN.- FRANK*

# MERCHANDISING LICENSE AGREEMENT

**THIS AGREEMENT** is entered into this 2nd day of September, 2005 ("Effective Date") by and between **PAN AMERICAN WORLD AIRWAYS, INC.**, a Delaware corporation with offices at 14 Aviation Avenue, Portsmouth, NH 03801 ("LICENSOR") and **MACHINE LTD., INC.**, a Delaware corporation with offices at 239 Chestnut Street, Philadelphia, PA 19106 ("LICENSEE").

## WITNESSETH:

**WHEREAS**, LICENSOR has certain rights in the Trademarks and Copyrights identified more fully in Section 1.1, below (the "Trademarks and Copyrights"); and

**WHEREAS**, LICENSOR is willing to grant to LICENSEE the right to authorize others to use the Trademarks and Copyrights on or in connection with certain products identified more fully in Section 1.2 below; and

**WHEREAS**, LICENSEE has represented that it desires and has the ability to manufacture, market and distribute, or to cause others to manufacture, market and distribute, the Licensed Products in the countries identified in certain geographic regions more fully identified in Section 1.3 below (the "Territory") and that it desires to authorize others to use the Trademarks and Copyrights on and in association with the Licensed Products;

**WHEREAS**, LICENSEE desires to obtain from LICENSOR the exclusive right to license others to use the Trademarks and Copyrights on and in connection with Licensed Products in the Territory; and

**WHEREAS**, both LICENSEE and LICENSOR are in agreement with respect to the terms a nd c onditions up on w hich LICENSEE s hall ha ve s uch r ights a s m ore fully provided below.

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the parties, each intending to be legally bound hereby, do promise and agree as follows.

1. **DEFINITIONS**: In addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below when used in this Agreement:

A. "Trademarks" shall mean the trademark/service mark "Pan Am" and "Pan Am and Globe" only in the particular logo forms and stylizations depicted in Exhibit A.

B. "Licensed Products" shall mean apparel, footwear and handbags, tote bags, purses, messenger bags, and luggage.

C. "Territory" shall mean the world.

D. "Gross Revenues" shall mean all Royalties due pursuant to Merchandising Agreements (prior to deduction of LICENSEE'S commission).

E. "Sub-Licensee Gross Revenues" shall mean a Sub-Licensee's gross revenues from wholesale sale of Licensed Products on or in connection with which the Trademarks are used, less only amounts granted for returns and allowances to customers.

F. "Minimum Performance Requirement" shall mean Sub-Licensee Gross Revenues of at least $100,000.00 per year. Provided, however, that there shall be an initial period of 18 months to meet the Minimum Performance Requirement to account for production start up time.

G. "Copyright" shall mean the rights of LICENSOR in the production, reproduction or copying of the Licensed Products.

## 2. LICENSE GRANT

A. LICENSOR hereby grants to LICENSEE, for the Term of this Agreement, the exclusive right to authorize others, subject to LICENSOR'S approval, to use the Trademarks and the non-exclusive right to use the Copyrights on or in connection with the Licensed Products in the Territory. For the avoidance of doubt, nothing in this Agreement shall grant Licensee the right on its own behalf to use the Trademarks or Copyrights on or in connection with Licensed Products or any other products or services except to produce a limited number of specimens to market the Licensed Products.

B. LICENSEE shall have the right to sublicense third parties (the "Sub-Licensees") to use the Trademarks and Copyrights on Licensed Products within the Territory, provided that Licensee Provides reasonable notice to LICENSOR of LICENSEE's intent to appoint such Sub-Licensees, and provided that LICENSOR consents in its sole discretion to the granting of such sublicense to the proposed Sub-Licensee. All sublicense agreements between Licensee and Sub-Licensees shall be subject to the express written approval of LICENSOR, which approval may be withheld for any reasonable reason. The parties acknowledge that any such agreement shall incorporate a minimum royalty rate of 6-10% of the Sub-Licensee Gross Revenues ("Royalty"). Moreover, any such agreement shall by its own terms terminate upon termination of this Agreement and shall contain provisions to ensure that the quality of Licensed Products is of a level commensurate with the level of quality historically associated with the Trademarks. Any deviations from the Merchandising Agreement shall be subject to approval of LICENSOR in its sole discretion, and all terms of such agreements will be consistent with and will not exceed the scope of this Agreement.

## 3. TERM AND TERMINATION

A. This Agreement and the provisions hereof, except as otherwise provided, shall be in full force and effect commencing on the Effective Date and shall continue through May 31, 2008 (the "Initial Term"). Subject to its satisfaction of the Minimum Performance Requirement

during the Initial Term or the applicable renewal period, LICENSEE shall have the right to extend this Agreement for three (3) additional periods of three (3) years each (each such three (3) year period being a "Renewal Period"), which Renewal Periods shall end on May 31, 2011, May 31, 2014 and May 31, 2017, respectively. In order to exercise said renewal options, LICENSEE shall give LICENSOR at least twelve months written notice prior to the conclusion of the Initial Term or applicable Renewal Period. In the event LICENSEE has not satisfied the Minimum Performance Requirement during the Initial Term or applicable Renewal Period, LICENSEE's right to extend this Agreement shall be subject to LICENSOR's approval in its sole discretion.

B.   In the event LICENSEE fails to renew this Agreement pursuant to Section 3.A, then LICENSOR shall thereafter be free to negotiate with any other party in respect of the rights granted by LICENSOR to LICENSEE in this Agreement.

C.   This Agreement may be terminated by either party upon thirty (30) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the thirty (30) days period, the breaching party fails to cure such breach.

## 4.   DUTIES AND OBLIGATIONS OF THE PARTIES

A.   LICENSEE shall, subject to LICENSOR's review and approval, develop a cohesive imaging and licensing program that focuses upon LICENSOR's core brand values and history, including, but not limited to, implementation studies of product categories, consumer research, focus groups, price point positional studies, and final development of a brand extension utilizing the Merchandising Agreement. LICENSEE shall be free to propose for approval by LICENSOR in its sole discretion new products to be included as Licensed Products.

B.   LICENSEE shall manage and interface with apparel manufacturing, product design and marketing firms to develop initial design direction, consistent with LICENSOR's imaging and licensing program and the core attributes of the Trademarks and Copyrights.

C.   LICENSEE shall develop a graphic ID standards manual which will be incorporated by reference in the Merchandising Agreement that shall delineate certain standards for use of the Trademarks to be utilized by all Sub-Licensees, including unified visual identity, explanation and use of Trademarks, colors, campaign, calendar, POP, catalogues, copy and graphic differences according to geographic/linguistic customs.

D.   LICENSEE shall develop a beta web site, security coded, for exclusive access by LICENSOR and Sub-Licensees to download updates and graphics.

E.   Subject to the conditions herein specified, LICENSEE shall use its best efforts consistent with sound business practices during the Term of this Agreement to find and conclude business arrangements with Sub-Licensees that are advantageous to LICENSOR and, after entry of Merchandising Agreements memorializing such arrangements, to reasonably service such arrangements and agreements during their term and the Term hereof, including, but not limited to, providing education and training to Sub-Licensees pertaining to the imaging and licensing program, monitoring the Sub-Licensees for quality standards and design specifications of the

Licensed Products and monitoring the distribution of the Licensed Products. LICENSEE shall provide quarterly reports to LICENSOR detailing the status of all licensing projects and opportunities.

F.  LICENSEE shall engage in such other activities as the parties may mutually agree and, in general use its best efforts consistent with sound business practices to maximize revenue generated from the use of the rights granted hereunder and to enhance the value and reputation of the Trademarks and Copyrights.

G.  LICENSEE shall oversee and be responsible for the payment by the Sub-Licensees of Royalties and other payments due under Sub-Licensee agreements, and shall provide quarterly and annual reports to LICENSOR detailing the status of Sublicensee Gross Sales, Royalties and other payments. If necessary, LICENSEE shall conduct periodic royalty investigations of the Sub-Licensee's books and records to ensure that all payments have been accurately computed and fully made. The cost of such royalty investigations shall be borne by LICENSEE; provided, however, that any recoveries received as a result of such investigation shall be initially applied against t he c ost o f c onducting s uch inv estigation a nd t hen div ided b etween LICENSOR a nd LICENSEE in accordance with Section 5.A hereof.

H.  It is understood that LICENSOR may have concepts and uses for the Trademarks and Copyrights other than on or in connection with the Licensed Products. During the Term of this Agreement, LICENSOR shall not attempt to license the Trademarks for use on products or services other than the L icensed Products (with the exception of uses o f the Trademarks by LICENSOR or its affiliates or licensees that predate the effective date of this Agreement), either by itself or through an agent, without first offering such opportunity to LICENSEE under the same terms and conditions as this Agreement. In the event that LICENSEE does not accept such offer in writing within thirty (30) days after notification by LICENSOR, LICENSOR shall be free to commence the commercialization or licensing of the Licensed Products with no obligation to LICENSEE.

I.  LICENSOR recognizes that LICENSEE performs similar services for its other clients and that LICENSOR's retention of LICENSEE is subject to such understanding. Provided, however, the LICENSEE's relationships with its other clients shall not unreasonably interfere with LICENSEE's performance of the terms and conditions of this Agreement.

5.  **COMPENSATION**

A.  In consideration for the licenses and other benefits granted hereunder, LICENSEE agrees that, within forty-five (45) days following conclusion of a each three-month period commencing w ith t he effective da te o f t his A greement, LICENSEE w ill p ay t o LICENSOR eighty percent (80%) of the Gross Revenues received by LICENSEE from all Sub-Licensees in that quarter.  (LICENSOR's eighty percent (80%) share of Gross Revenues being the "LICENSOR Premium.")

B.  LICENSOR agrees to reimburse LICENSEE out of payments received by LICENSOR pursuant to this Agreement, for all reasonable expenses incurred on behalf of

LICENSOR, including travel, presentation and materials, provided that such expenses have previously been approved by LICENSOR.

C.  In the event that this Agreement should expire or terminate, LICENSEE shall be entitled to post-termination compensation pursuant to Section 5 from Merchandising Agreements entered into pursuant to this Agreement, such compensation to continue until the exhaustion of all Royalties due under such Merchandising Agreement or any extension, renewal or modification of it.

D.  All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties.

E.  All fees payable hereunder shall be based upon the official exchange rate on the date on which such payment is due.  If, by any reason of any governmental or fiscal restrictions affecting the convertibility, payment cannot be made in U.S. funds, then LICENSEE shall take such reasonable actions with respect to payment due as LICENSOR may direct.

## 6.  REPRESENTATIONS AND WARRANTIES

A.  LICENSOR represents and warrants that, as of the Effective Date, it owns trademark registrations for the Trademarks as detailed in Exhibit A.

B.  Each of the parties represents and warrants to the other that it has the legal right, authority and capacity to enter into this Agreement and to make the covenants and grant the rights granted in it, and that there is no other agreement, and that it will not during the term of this Agreement enter any other agreement, in conflict herewith.

## 8.  AUDIT

A.  LICENSOR shall have the right, upon at least ten (10) days written notice and no more than once per calendar year, to inspect or authorize a third party to inspect LICENSEE's books and records and all other documents and materials in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

B.  All books and records relative to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three years after the date to which they pertain.

C.  In the event that LICENSOR or LICENSOR's agent makes an investigation of LICENSEE's b ooks a nd r ecords, c ertain c onfidential a nd p roprietary b usiness inf ormation o f LICENSEE may necessarily be made available to the person or persons conducting such investigation.  It is agreed that such confidential and proprietary business information shall be retained in confidence by LICENSOR and shall not be used by LICENSOR or disclosed to any third party for a period of five (5) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law.  It is understood and agreed, however,

that such information may be used in any proceeding based on LICENSEE's failure to pay its Royalty obligation or guaranteed minimum annual payment, or its failure otherwise to meet any of its obligations under this Agreement.

## 9. NOTICES, QUALITY CONTROL & SAMPLES

A. The rights granted hereunder are conditioned upon LICENSEE's full and complete compliance with the marking provisions of the trademark, patent and copyright laws of the United States and other countries in the Territory, and LICENSEE's causing Sub-Licensees to do the same.

B. All Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices as required by LICENSOR.

C. The Licensed Products shall be of a high quality which is at least equal to the level of quality associated with the Trademarks and Copyrights.

D. At least once during each calendar year, LICENSEE shall submit to LICENSOR, for approval, two (2) samples of each of the Licensed Products that is manufactured, sold or distributed pursuant to a Merchandising Agreement, and all packaging, advertising and promotional materials (whether in print, electronic or any other medium) used in connection therewith.

## 10. NOTICE AND PAYMENT

A. Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at the above stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

B. Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

## 8. PATENTS, TRADEMARKS AND COPYRIGHTS

A. LICENSEE shall pay all costs, expenses and legal fees associated with prosecuting and maintaining trademark registrations for the Trademarks and Copyrights in each jurisdiction in which it authorizes through a Merchandising Agreement the sale, manufacture or distribution of Licensed Products bearing any of the Trademarks. Such applications and registrations shall be owned by LICENSOR and LICENSOR shall control and have the right to direct such prosecution and maintenance in its sole discretion. Such applications and registrations shall encompass, at a minimum, all of the Licensed Products.

B. The parties agree to execute any documents reasonably requested by the other party to effect any of the above provisions.

C. LICENSEE agrees that its and Sub-Licensee's use of the Trademarks and Copyrights inures to the benefit of LICENSOR and that neither LICENSEE nor any Sub-Licensee shall acquire any rights in the Trademarks and Copyrights or the good will associated therewith.

## 10. POST TERMINATION RIGHTS

A. Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all inventory of Licensed Products then on-hand as well as all work in progress (the "Inventory").

B. Upon the expiration or termination of this Agreement, all of the rights of LICENSEE under this Agreement shall forthwith terminate and immediately revert to LICENSOR, all Merchandising Agreements shall terminate by their own terms, and LICENSEE shall immediately cause all Sub-Licensees to discontinue all use of the Trademarks and Copyrights, at no cost whatsoever to LICENSOR.

## 11. GOOD WILL

LICENSEE recognizes the value of the good will associated with the Trademarks and Copyrights and acknowledges that the Trademarks and Copyrights and all rights therein including the good will pertaining thereto belong exclusively to LICENSOR.

## 12. INFRINGEMENTS

A. LICENSOR shall have the right, but not the obligation, at its own cost and expense, to institute and prosecute lawsuits or other enforcement efforts ("Actions") against third persons for infringement or other violation of the rights licensed in this Agreement or the Merchandising Agreements. Should LICENSEE learn of any potential or actual infringement or other violation of the rights licensed under this Agreement or one of the Merchandising Agreements, LICENSEE shall promptly notify LICENSOR. If LICENSEE should desire that LICENSOR institute an Action, LICENSEE shall make a written request to LICENSOR to do so.

B. If LICENSOR does not institute an Action within ninety (90) days after LICENSEE's written request that LICENSOR do so, LICENSEE may institute and prosecute such lawsuit on its own behalf. Any Action shall be prosecuted solely at the cost and expense of the party bringing the Action and all sums recovered in any such Action, whether by judgment, settlement or otherwise, in excess of the amount of reasonable attorneys' fees actually paid to the party's counsel and other out of pocket expenses of such suit, shall be divided equally between the parties.

C. Upon request of the party bringing the Action, the other party shall execute all papers, testify o n a ll m atters, a nd o therwise c ooperate in e very w ay n ecessary a nd de sirable f or t he prosecution of any such Action, including consenting to joinder in the Action. The party bringing suit shall reimburse the other party for the expenses incurred as a result of such cooperation.

## 13. INDEMNITY

LICENSEE agrees to defend and indemnify LICENSOR, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) that arise from claims of third parties against LICENSEE or LICENSOR arising out of either LICENSEE's or a Sub-Licensees' use of the Trademarks, Copyrights or relating to Licensed Products.

## 14. INSURANCE

LICENSEE shall, throughout the Term of the Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business in New York, standard Product Liability Insurance naming LICENSOR as an additional named insured. Such policy shall provide protection against any and all claims, demands and causes of action covered by the indemnification provisions of this Agreement, including without limitation those arising out of any defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The amount of coverage shall be as specified in Schedule A attached hereto. The policy shall obligate the insurer to provide notice to LICENSOR by Registered or Certified Mail, return receipt requested, within ten (10) days in the event of any modification, cancellation or termination thereof. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within thirty (30) days after execution of this Agreement.

## 15. FORCE MAJEURE

It is understood and agreed that in the event of an act of the government, or war conditions, or fire, flood or labor trouble in the factory of LICENSEE or in the factory of those manufacturing parts necessary for the manufacture of the Licensed Products, prevent the performance by LICENSEE of the provisions of this Agreement, then such nonperformance by LICENSEE shall not be considered as grounds for breach of this Agreement and such nonperformance shall be excused while the conditions herein prevail and for two (2) months thereafter.

## 16. JURISDICTION & DISPUTES

A. This Agreement shall be governed in accordance with the laws of the State of New York.

B. All disputes under this Agreement shall be resolved by the courts located in the State of New York including the United States District Court for the Southern District of New York and each of the parties consents to the jurisdiction of such courts, agrees to accept service of process by mail, and hereby waives any jurisdictional or venue defenses otherwise available to it.

## 17. ASSIGNMENT/AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, successors and permitted assigns. Any assignment of this Agreement by LICENSEE shall be subject to the express written approval of LICENSOR, which approval shall not unreasonably be withheld. Any assignment by LICENSEE in violation of this provision shall be considered null and void from its inception.

## 18. WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

## 19. SEVERABILITY

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

## 20. NO JOINT VENTURE

Nothing contained herein shall constitute this arrangement to be employment, a joint venture or a partnership.

## 22. INTEGRATION

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties, including any option agreements which may have been entered into between the parties, and is intended as a final expression of their Agreement. It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over any other documents which may be in conflict with said Agreement.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused to be affixed hereto its or his/her hand and seal the day indicated.

PAN AMERICAN WORLD AIRWAYS, INC.    MACHINE LTD, INC.

By: _____    By: _____

Title: _Sr. VP_____    Title: _President_____

Date: _9/2/05_____    Date: _9/12/05_____

Exhibit A





**Plaintiff's Exhibit 2a**

06/23/2006  07:52  6037662094
06/20/2006 19:43 FAX 18786631213
06/20/2006 17:34 FAX
06/20/2006 63:12 FAX 18786651215

GUILFORD TRANSPORT
LAW DEPARTMENT
LAW DEPARTMENT

PAGE  02

## CONTRACT AMENDMENT NO. 1
## TO
## MERCHANDISING LICENSE AGREEMENT

THIS CONTRACT AMENDMENT NO. 1 (the "Amendment") is entered into effective as of this 19th day of June 2006, between PAN AMERICAN WORLD AIRWAYS, INC. (hereafter "PAN AM") and MACHINE PROJECT, INC. (hereafter "MACHINE").

Whereas, PAN AM and MACHINE are parties to the Merchandising License Agreement (the "Agreement") dated September 2, 2005.

Whereas, PAN AM and MACHINE desire to amend the Agreement in order to reflect certain business name and address changes undertaken by MACHINE,

THEREFORE, in consideration of the mutual covenants and conditions in this Amendment and the Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. The page attached to this Amendment as Exhibit A, and incorporated herein by reference, hereby replaces an existing page in the Agreement, in its entirety, as follows:

| Existing pages (Remove) | Replacement Pages (Attached) |
|---|---|
| 1 | 1 |

2. The Agreement, as modified by the express terms of this Amendment, is hereby ratified and affirmed by PAN AM and MACHINE, and shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Amendment effective as of the date first above written.

PAN AMERICAN WORLD AIRWAYS, INC.

By: _____

Title: Sr VP

Date: 6/22/06

MACHINE PROJECT, INC.

By: _____

Title: President

Date: 6-20-06

**Plaintiff's Exhibit 3**

# MERCHANDISING LICENSE AGREEMENT

**THIS AGREEMENT** (the "Agreement") is entered into as of the 1st day of January, 2007 ("Effective Date") by and between **PAN AMERICAN WORLD AIRWAYS, INC.**, a Delaware corporation with offices at 14 Aviation Avenue, Portsmouth, NH 03801 ("LICENSOR") and **MACHINE PROJECT, INC.**, a New York corporation with offices at 241 37th Street, Seventh Floor, New York, New York 10018 ("LICENSEE").

## W I T N E S S E T H:

**WHEREAS**, LICENSOR and Machine Ltd., which is a predecessor company of LICENSEE, entered a Merchandising License Agreement with an effective date of September 2, 2005 that was amended on June 22, 2006 to replace Machine Ltd. With LICENSEE, and LICENSOR and LICENSEE now desire to terminate that agreement in its entirety and to enter this Agreement;

**WHEREAS**, LICENSOR has certain rights in the Trademarks (as defined in Section 1.S, below;

**WHEREAS**, LICENSOR is willing to grant to LICENSEE the right to use and to authorize others to use the Trademarks;

**WHEREAS**, LICENSEE has represented that it desires and has the ability to manufacture, market, distribute and promote, and to cause others to manufacture, market, distribute and promote, Licensed Products (as defined in Section 1.F, below) in the Territory (as defined in Section 1.R, below);

**WHEREAS**, LICENSOR desires to grant to LICENSEE the right to manufacture, market, distribute and promote Licensed Products in the Territory; and

**WHEREAS**, both LICENSEE and LICENSOR are in agreement with respect to the terms and conditions upon which LICENSEE shall have such rights as more fully provided below.

**NOW, THEREFORE**, in consideration of the promises and agreements set forth herein, the receipt and sufficiency of which are acknowledged, the parties, each intending to be legally bound hereby, do promise and agree as follows.

1.    **DEFINITIONS:** In addition to the terms defined elsewhere in this Agreement, the following terms shall have the meanings set forth below when used in this Agreement:

A.    "Artworks" shall mean the works of art identified in Schedule C to this Agreement, as such exhibit may be amended from time to time upon LICENSEE's request to add new works of art, but subject to LICENSOR's approval of such proposed works of art for consistency with the core values associated with the Trademarks.

1

**B.**    "Asia" shall mean that list of countries listed under the heading "Asia" in Schedule D, as such list may be amended from time to time pursuant to this Agreement.

**C.**    "Combined Online Revenues" shall mean the total of Online Revenues and LICENSOR Revenues.

**D.**    "First Renewal Term" shall have the meaning ascribed in Section 4.A.

**E.**    "Initial Term" shall have the meaning ascribed in Section 4.A.

**F.**    "Licensed Products" shall mean Merchandising Products on or in connection with which one or more of the Trademarks is used or appears.

**G.**    "LICENSEE Gross Revenues" shall mean the total of Online Revenues, Wholesale Revenues and Sublicensee Revenues.

**H.**    "LICENSOR Revenues" shall mean LICENSOR's gross revenues from retail sale of Licensed Products via an interactive internet website, less only credits granted to customers of LICENSOR for returns or allowances.

**I.**    "Merchandising Products" shall mean those products listed in Exhibit B to this Agreement, as such exhibit may be amended from time to time upon LICENSEE's request but subject to LICENSOR's approval in its sole discretion.

**J.**    "Minimum Performance Requirement" shall mean LICENSEE Gross Revenues of at least one million five hundred thousand U.S. dollars ($1,500,000.00) for each Royalty Year during the Initial Term, two million U.S. dollars ($2,000,000.00) per Royalty Year during the First Renewal Term, and two million five hundred thousand U.S. dollars ($2,500,000.00) per Royalty Year during the Second Renewal Term.

**K.**    "Online Revenues" shall mean LICENSEE's gross revenues from retail sale of Licensed Products via an interactive internet website, less only credits granted to customers of LICENSEE for returns or allowances.

**L.**    "Renewal Term" shall have the meaning ascribed in Section 4.A.

**M.**    "Royalty" shall mean any and all payments payable to LICENSOR by LICENSEE pursuant to this Agreement.

**N.**    "Royalty Year" shall mean a one-year period commencing on January 1 of a given year.

**O.**    "Second Renewal Term" shall have the meaning ascribed in Section 4.A.

**P.**    "Sublicensee Revenues" shall mean total gross revenues of all Sublicensees from wholesale sale of Licensed Products, less only credits granted to customers of such Sublicensees for returns or allowances.

**Q.** "Term" shall mean the Initial Term and any Renewal Terms.

**R.** "Territory" shall mean all jurisdictions listed in Exhibit D to this Agreement, as such Schedule may be amended from time to time pursuant to Section 3.

**S.** "Trademarks" shall mean the trademarks/service marks PAN AM, the PAN AM AND GLOBE design, PAN AMERICAN WORLD AIRWAYS and the PAA AND WING design, in each case only in the particular logo forms and stylizations depicted in Exhibit A to this Agreement.

**T.** "Wholesale Revenues" shall mean Licensee's gross revenues from wholesale sale (the amount billed to customers) of Licensed Products, less discounts and allowances actually attributable to the Licensed Products as shown on an invoice and, further, less any bona fide returns (net of all returns actually made or allowed as supported by credit memoranda actually issued to customers). All taxes shall be Licensee's responsibility. No other costs incurred in the manufacturing, selling, advertising and/or distribution of the Licensed Products shall be deducted from the Wholesale Revenues nor shall any deduction be allowed for any uncollectible amounts or allowances.

## 2. LICENSE GRANT/LIMITATIONS ON LICENSE

**A.** Subject to the limitations provided in this Agreement, LICENSOR hereby grants to LICENSEE during the Term:

> i) the exclusive, sublicensable right (subject to the limits on exclusivity and sublicensing provided herein) to use the Trademarks in the Territory on Merchandising Products and in connection with the sale, distribution, advertising and promotion of Merchandising Products in the Territory;

> ii) the non-exclusive and non-sublicensable right to use the Trademarks and the PAN AM ONE.COM mark in the Territory in connection with retail sales services that are rendered by means of an interactive internet website, provided that the only products sold at such interactive internet website or through such online retail sales services shall be Licensed Products; and

> iii) the exclusive and non-sublicensable right to use the panamone.com internet domain name.

**B.** License Restrictions

> i) LICENSEE specifically acknowledges and agrees that nothing in this Agreement authorizes LICENSEE to use the Trademarks or PAN AM ONE.COM mark in connection with retail sales services other than through the interactive internet website specifically allowed in Section 2.A.ii of this Agreement or with the express written consent of L icensor, which consent may be withheld for any reasonable reason. LICENSEE acknowledges that its failure to adhere to the requirement of this paragraph with respect to any

3



Merchandising Sublicense shall constitute a material breach of this Agreement.

ii) LICENSEE's right to sublicense as provided in Section 2.A.i of this Agreement is subject to LICENSEE's provision of reasonable notice to LICENSOR of LICENSEE's intent to appoint a sublicensee ("Sublicensee"), and LICENSOR's advance written consent in its sole discretion to the granting of a sublicense to the proposed Sublicensee. Each of LICENSEE's agreements with Sublicensees ("Merchandising Sublicenses") shall be in the form of agreement to be prepared and provided by LICENSOR (the "Form Merchandising Sublicense"), shall name LICENSOR as an intended third party beneficiary, and shall be subject to the express advance written approval of LICENSOR, which approval may be withheld by LICENSOR for any reasonable reason. Any deviations from the Form Merchandising Sublicense shall be subject to approval of LICENSOR in its sole discretion. Moreover, Each Merchandising Sublicense shall by its own terms (i) set a royalty rate of at least six percent (6%) of Sublicensee Revenues; (ii) provide that LICENSOR, up on t ermination o f t his Ag reement, s hall ha ve t he o ption o f either terminating such Merchandising Sublicense or assuming it from LICENSEE; a nd (iii) s hall c ontain p rovisions t o e nsure t hat t he qu ality o f Licensed Products meets the Quality Standard.   All terms of each Merchandising Sublicense (including without limitation the scope of licenses granted therein) shall be consistent with and shall not exceed the scope of this Agreement.   LICENSEE acknowledges that its failure to adhere to the requirement of this paragraph with respect to any Merchandising Sublicense shall constitute a material breach of this Agreement.

iii) The rights granted to LICENSEE by LICENSOR in Section 2.A.i of this Agreement shall be exclusive throughout the world; provided, however, that (i) exclusivity shall not apply to those countries that now are members of, or that in the future become members of, the European Union, (ii) the exclusivity shall be subject to rights in the Trademarks granted prior to the Effective Date by LICENSOR or its predecessors to third parties, including without limitation the right granted to Dragon Models to use the PAN AM mark and PAN AM GLOBE logo on or in connection with 1:400 scale models of aircraft types operated by LICENSOR (or its predecessor) in its fleet, including Boeing B747 and Boeing B737 aircraft; and (iii) LICENSOR reserves to itself the right to use the Trademarks in the Territory on products other than Merchandising Products and in connection with the sale, distribution, advertising and promotion (but not the manufacture of Merchandising Products) of those products and Merchandising Products in the Territory, provided; however, that any sales of Merchandising Products by LICENSOR shall not be at a price lower than that charged by LICENSEE or Sublicensees, except for sales to LICENSOR's employees.

iv) Before entering any agreement with a manufacturer, distributor or retail outlet for t he m anufacture, s ale o r dis tribution o f Licensed P roducts, LICENSEE

4

shall obtain LICENSOR's advance written approval of such manufacturer, distributor or retail outlet. LICENSOR's right of approval or disapproval shall be in its reasonable and timely discretion.

v) LICENSEE specifically acknowledges and agrees that its exercise in any manner of any of the rights granted in Section 2.A.i or Section 2.A.ii in any jurisdiction that is not in the Territory shall be deemed a material breach of this Agreement.

C.     All LICENSOR's rights in the Trademarks and the PAN AM ONE.COM mark are reserved to LICENSOR unless specifically licensed to LICENSEE herein.

## 3.   AMENDMENT OF TERRITORY

A.     The scope of the Territory may be amended from time to time upon LICENSEE's request, subject to LICENSOR's approval in its reasonable discretion as provided herein. At least eight (8) weeks before LICENSEE commences (or, with respect to a Merchandising Sublicense, before a Sublicensee commences) the manufacture, distribution, promotion or sale of one or more Licensed Product in a country that is not at that time listed in Exhibit D (a "Proposed Jurisdiction"), LICENSEE shall provide LICENSOR with written notice of its desire to expand the Territory to include such Proposed Jurisdiction. Within four (4) weeks of its receipt of such notification from LICENSEE, LICENSOR shall inform LICENSEE of whether or not it approves of expansion of the Territory to include such Proposed Jurisdiction. LICENSOR's approval of such expansion shall be in its reasonable discretion, and reasonable grounds for disapproval shall include without limitation the determination that LICENSEE's manufacture, distribution, promotion or sale of Licensed Products in such Proposed Jurisdiction would create an undue risk of violation of the intellectual property rights of a third party or of damage to LICENSOR's rights in the Trademarks. In the event LICENSOR denies expansion of the Territory to include a Proposed Jurisdiction, LICENSOR shall make reasonable efforts to provide LICENSEE with an alternative mark or marks to use in such jurisdiction.

## 4.   TERM/TERMINATION/MINIMUM PERFORMANCE REQUIREMENT

A.     This Agreement and the provisions hereof, except as otherwise provided herein, shall be in full force and effect commencing on the Effective Date and shall continue through December 31, 2011 (the "Initial Term"). Subject to its satisfaction of the Minimum Performance Requirement, LICENSEE shall have the right to extend this Agreement for two (2) additional periods of five (5) years each (each such five (5) year period being a "Renewal Period"), with the "First Renewal Period" ending December 31, 2016, and the "Second Renewal Period" ending December 31, 2021. In order to exercise its renewal options, LICENSEE shall give LICENSOR at least twelve months written notice prior to the conclusion of the Initial Term or applicable Renewal Period.

B.     In the event LICENSEE has not satisfied the Minimum Performance Requirement during any Royalty Year during the Initial Term or applicable Renewal Period:

i) LICENSEE's right to extend this Agreement shall be subject to LICENSOR's approval in its sole discretion; or

5



    ii) LICENSOR shall have the option (i) to collect from LICENSEE the Royalty that would have been due from LICENSEE if the Minimum Performance Requirement for such Royalty Year had been satisfied (with a credit for Royalty payments already made on LICENSEE Gross Revenues for that Royalty Year), or (ii) to terminate this Agreement and all licenses granted herein upon thirty (30) days written notice to LICENSEE.

    **C.**    In the event LICENSEE fails to satisfy the Minimum Performance Requirement during any Royalty Year or to timely exercise its option to renew this Agreement pursuant to Section 4.A, LICENSOR thereafter shall be free to negotiate with any other party in respect of the rights granted by LICENSOR to LICENSEE in this Agreement.

    **D.**    This Agreement may be terminated by either party upon thirty (30) days written notice to the other party in the event of a breach of a material provision of this Agreement by the other party, provided that, during the thirty (30) days period, the breaching party fails to cure such breach.

    **E.**    Effects of Termination

    i) Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, LICENSEE shall provide LICENSOR with a complete schedule of all its and Sublicensees' inventory of Licensed Products as well as all work in progress (the "Inventory").

    ii) Upon the expiration or termination of this Agreement, all of the rights of LICENSEE under this Agreement shall terminate and immediately revert to LICENSOR, LICENSEE shall immediately cause all Sublicensees to discontinue all use of the Trademarks (unless the applicable Merchandising Sublicense is assumed by LICENSOR pursuant to Section 2.B.ii), and LICENSEE will have one year to sell all Inventory (and, except with respect to those Merchandising Sublicenses assumed by LICENSOR pursuant to Section 2. B.ii, shall cause all Sublicensees to do the same), all at no cost whatsoever to LICENSOR.  If in the case another LICENSEE is obtained, they may purchase the inventory at cost plus 20%.

    iii) Immediately upon expiration or termination of this Agreement, LICENSEE shall inactivate the internet web site located at www.panamone.com, cease all commercial activity and all use of such domain name and all use of the Trademarks and the PAN AM ONE.COM mark at such site, and shall assign to LICENSOR the domain name registration for the www.panamone.com internet domain name.

    iv) The agreement between LICENSOR and Machine, Ltd, a predecessor company of LICENSEE, effective as of September 2, 2005 is hereby terminated by mutual agreement of LICENSOR and LICENSEE.

6

## 5.    DUTIES AND OBLIGATIONS OF LICENSEE

**A.**    LICENSEE shall, subject to LICENSOR's advance review and approval, develop a cohesive imaging and licensing program that focuses upon LICENSOR's core brand values as contemplated by this Agreement.

**B.**    LICENSEE shall develop a graphic ID standards manual for LICENSOR's review and approval in its discretion (the "Usage Guidelines"). The Usage Guidelines shall delineate certain standards for use of the Trademarks. LICENSEE shall adhere to such Usage Guidelines and shall cause all Sublicensees to do the same.

**C.**    Subject to the conditions herein specified, LICENSEE shall use its best efforts consistent with sound business practices during the Term to find and conclude business arrangements with Sublicensees that are advantageous to LICENSOR and, after entry of Merchandising Sublicenses memorializing such arrangements, to reasonably service such arrangements and agreements during their term and the term hereof, including, but not limited to, providing guidance and education to Sublicensees pertaining to the imaging and licensing program, monitoring the Sublicensees for their adherence to the Quality Standards (as defined in Section 8.C), LICENSEE shall provide yearly reports to LICENSOR detailing the status of all sublicensing projects and opportunities, and all of LICENSEE's manufacturing, sales, distribution and promotion activities concerning Licensed Products.

**D.**    LICENSEE shall engage in such other activities as the parties may mutually agree and, in general use its best efforts consistent with sound business practices to maximize revenue generated from the use of the rights granted hereunder and to enhance the value and reputation of the Trademarks.

**E.**    LICENSEE shall oversee and be responsible for payments due from Sublicensees under Merchandising Sublicenses, and shall provide quarterly and annual reports to LICENSOR. Such reports shall be certified by an authorized financial officer of LICENSEE or LICENSEE's accountant, and shall include a full and accurate statement showing (i) the number of each type of Licensed Product sold by LICENSEE and Sublicensees, (ii) the revenues derived therefrom, indicating the particular Licensed Product from which the revenues were derived and whether the revenues constitute Online Revenues, Wholesale Revenues or Sublicensee Revenues, and (iii) all such other information and details necessary to compute and verify the accuracy of Royalties. If necessary, LICENSEE shall conduct periodic investigations of Sublicensees' books and records to ensure that all payments have been accurately computed and fully made. The cost of such royalty investigations shall be borne by LICENSEE; provided, however, that any recoveries received as a result of such investigation shall be applied initially against the cost of conducting such investigation and then divided equally between LICENSOR and LICENSEE.

**F.**    It is understood that LICENSOR may have concepts and uses for the Trademarks or Artworks other than for use on or in connection with the Merchandising Products. During the Term, LICENSOR shall not license the Trademarks for use on or in connection with products or services other than the Merchandising Products (with the exception of uses of the Trademarks by LICENSOR or its affiliates or licensees that predate the effective date of this Agreement), either by itself or through an agent, without first offering such opportunity to LICENSEE under the

7



same terms and conditions as this Agreement. In the event that LICENSEE does not accept such offer in writing within thirty (30) days after notification by LICENSOR, LICENSOR shall be free to commence the commercialization or licensing of the Trademarks other than on or in connection with the Merchandising Products with no obligation to LICENSEE.

**G.**    LICENSOR recognizes that LICENSEE performs similar services for its other clients and that LICENSOR's retention of LICENSEE is subject to such understanding. Provided, however, that LICENSEE's relationships with its other clients shall not unreasonably interfere with LICENSEE's performance of the terms and conditions of this Agreement.

**H.**    LICENSEE agrees to sell Licensed Products to LICENSOR in exchange for LICENSOR's payment of a price equal to the Wholesale price for each item less 20 % plus reasonable shipping and handling costs if applicable.

**I.**    LICENSEE agrees that it shall use at least one of the Trademarks on each Merchandising Product on which one or more of the Artworks appears.

**J.**    LICENSEE shall make available to LICENSOR a link between LICENSOR'S internet website and LICENSEE'S panamone.com internet website (or such other website that LICENSEE develops for the online sale of Merchandise Products) that will enable users of LICENSOR'S internet website to purchase Merchandise Products at retail prices. For any purchases using such link, LICENSEE shall be responsible for shipping the Merchandise Products to the purchasers, and shall pay to LICENSOR the difference between the retail price and the cost of the Merchandise Products. If purchasers that initially purchased Merchandise Products via LICENSOR'S internet website were to purchase additional Merchandise Products in the future via LICENSEE'S internet website, those purchases shall be treated as if they were made via LICENSOR'S internet website, and payment shall be made to LICENSOR in accordance with this paragraph.

**K.**    LICENSEE acknowledges and agrees that its breach of any of the obligations contained in this Section 5 shall be considered a material breach of this Agreement sufficient to justify termination of this Agreement.

6.    **COMPENSATION**

      **A.**    Wholesale sales by LICENSEE.

          i) Within thirty (30) days following the end of each calendar month following the Effective Date, LICENSEE shall pay to LICENSOR a royalty of six percent (6%) of Wholesale Revenues attributable to Asia, and seven percent (7%) of Wholesale Revenues attributable to countries outside of Asia. In the event that Wholesale Revenues for a particular Royalty Year exceed twenty million U.S. dollars ($20,000,000.00), the parties shall negotiate in good faith to determine a suitable royalty rate in excess of six percent (6%) and seven percent (7%) (for Asia and countries outside Asia, respectively) for Wholesale Revenues that exceed twenty million U.S. dollars ($20,000,000.00.

      **B.**    Online Sales

i) Within thirty (30) days following the end of each calendar month following the Effective Date, LICENSEE shall pay to LICENSOR a royalty of (i) six percent (6%) of Online Revenues for the first ten million U.S. dollars ($10,000,000.00) of Combined Online Revenues in each Royalty Year, seven percent (7%) of Online Revenues for the second ten million U.S. dollars of Combined Online Revenues in each Royalty Year, and ten percent (10%) of Online Revenues for the third ten million U.S. dollars ($10,000,000.00) of Combined Online Revenues in each Royalty Year. In the event that Combined Online Revenues for a particular Royalty Year exceed fifty million U.S. dollars ($50,000,000.00), the parties shall negotiate in good faith to determine a suitable royalty rate in excess of ten percent (10%) for Online Revenues that exceed fifty million U.S. dollars ($50,000,000.00).

**C.**    Sales by SUBLICENSEES

i) Within forty-five (45) days following the end of each quarterly period following the Effective Date, LICENSEE will pay to LICENSOR one hundred percent (100%) of the royalty received by LICENSEE at a rate of 6% from Merchandising Sublicenses during such quarter.

**D.**    Miscellaneous

i) All payments due hereunder shall be made in United States currency drawn on a United States bank, unless otherwise specified between the parties.

ii) All fees payable hereunder shall be based upon the HSBC official exchange rate on the date on which such payment is due. If, by any reason of any governmental or fiscal restrictions affecting the convertibility, payment cannot be made in U.S. funds; then LICENSEE shall take such reasonable actions with respect to payment due as LICENSOR may direct.

iii) Any payment not paid by LICENSEE when due for any reason shall accrue interest payable to LICENSOR from the day after payment was due until payment is made, which interest shall be at the rate of one and one half percent (1 ½%) per month or the maximum amount permitted by U.S. law, whichever is greater.

**7.    AUDIT**

**A.**    LICENSOR shall have the right, upon at least ten (10) days written notice and no more than once per calendar year, to inspect or authorize a third party [Big 4 or equal] to inspect LICENSEE's books and records and all other documents and materials in the possession of or under the control of LICENSEE with respect to the subject matter of this Agreement at the place or places where such records are normally retained by LICENSEE.

**B.**    All books and records relevant to LICENSEE's obligations hereunder shall be maintained and kept accessible and available to LICENSOR for inspection for at least three years after the date to which they pertain.

9

C.    In the event that LICENSOR or LICENSOR's agent makes an investigation of LICENSEE's books and records, certain confidential and proprietary business information of LICENSEE may necessarily be made available to the person or persons conducting such investigation. It is agreed that such confidential and proprietary business information shall be retained in confidence by LICENSOR and shall not be used by LICENSOR for purposes other than with respect to the subject matter of this Agreement or disclosed to any third party for a period of five (5) years from the date of disclosure, or without the prior express written permission of LICENSEE unless required by law. It is understood and agreed, however, that such information may be used in any proceeding based on LICENSEE's failure to pay its Royalty obligation, or its failure otherwise to meet any of its obligations under this Agreement.

## 8.    QUALITY CONTROL & SAMPLES

A.    The rights granted hereunder are conditioned upon LICENSEE's full and complete compliance with the marking provisions of the trademark and copyright laws of the United States and other countries in the Territory, and LICENSEE's causing Sublicensees to do the same.

B.    All Licensed Products, as well as all promotional, packaging and advertising material relative thereto, shall include all appropriate legal notices as required under law or by LICENSOR.

C.    The Licensed Products, whether manufactured, distributed or sold by LICENSEE or a Sublicensee, shall be of a high quality in design, materials and workmanship and of a level of quality that is reasonably acceptable to LICENSOR and at least equal to the level of quality historically associated with the Trademarks (the "Quality Standard"). For the avoidance of doubt, the failure of Licensed Products to attain the Quality Standard shall be considered a material breach of this Agreement or a Merchandising Sublicense, and shall be considered sufficient grounds for termination thereof. ·

D.    At least two (2) weeks before LICENSEE or a Sublicensee begins the manufacture of a New Licensed Product or any alteration of a previously approved Licensed Product, LICENSEE shall submit to LICENSOR for approval one (1) prototype of such New Licensed Product, including all packaging, advertising and promotional materials. Moreover, at least two (2) weeks before LICENSEE or a Sublicensee first ships a New Licensed Product for sale or distribution, LICENSEE shall submit to LICENSOR for approval two (2) samples of such New Licensed Product and all associated packaging, advertising and promotional materials. In each case, LICENSOR shall have the right to deny approval of the New Licensed Product (i) in its reasonable discretion, (ii) if such New Licensed Product fails to be in compliance with the terms of this Agreement, (iii) if such New Licensed Product fails to meet the Quality Standard, or (iv) if LICENSOR determines in its reasonable discretion that such New Licensed Product is inconsistent with or damaging to the core attributes associated with the Trademarks. "New Licensed Product" shall mean a L icensed Product of a genus, model or version that has not previously been submitted to LICENSOR for approval under this subsection 8.D.

10

9.    **NOTICE**

**A.**    Any notice required to be given pursuant to this Agreement shall be in writing and delivered personally to the other designated party at its above stated address or mailed by certified or registered mail, return receipt requested or delivered by a recognized national overnight courier service.

**B.**    Either party may change the address to which notice or payment is to be sent by written notice to the other in accordance with the provisions of this paragraph.

10.    **TRADEMARK OWNERSHIP AND REGISTRATION**

**A.**    LICENSOR shall determine in its sole discretion whether, when and where to file for trademark registration, or to maintain existing trademark registrations, for the Trademarks.

**B.**    In the event that LICENSOR elects to file a new application in a country located in the Territory for registration of any of the Trademarks for use on or in connection with Licensed Products, LICENSEE shall reimburse LICENSOR for all costs, expenses and legal fees associated with prosecuting and maintaining such application(s) for trademark registration and any resulting registration(s). Such applications and registrations shall be owned by LICENSOR and LICENSOR shall control and have the right to direct such prosecution and maintenance in its sole discretion.

**C.**    The parties agree to execute any documents reasonably requested by the other party to effect any of the provisions of this Section.

**D.**    LICENSEE acknowledges LICENSOR's exclusive ownership of the Trademarks and all associated goodwill. LICENSEE agrees that its and each Sublicensee's use of the Trademarks inures to the benefit of LICENSOR and that neither LICENSEE nor any Sublicensee shall acquire any rights in the Trademarks or the good will associated therewith. LICENSEE further agrees that it will not apply in any jurisdiction for trademark registration of any of the Trademarks or any confusingly similar alternatives, and that it will not oppose, petition to cancel or otherwise contest LICENSOR's applications or registrations for the Trademarks or similar marks.

11.    **INFRINGEMENTS**

**A.**    LICENSOR shall have the right, but not the obligation, at its own cost and expense, to institute and prosecute lawsuits or other enforcement efforts such as arbitrations, administrative proceedings and demand letters ("Actions") against third persons for infringement or other violation of the rights licensed in this Agreement or the Merchandising Sublicenses. Should LICENSEE learn of any potential or actual infringement or other violation of the rights licensed under this Agreement or any of the Merchandising Sublicenses, LICENSEE shall promptly notify LICENSOR. If LICENSEE should desire that LICENSOR institute an Action, LICENSEE shall make a written request to LICENSOR to do so. If LICENSOR does not institute an Action within ninety (90) days after LICENSEE has made a written request that LICENSOR do so, LICENSEE may institute and prosecute such Action on its own behalf with LICENSOR's advance written consent, which LICENSOR shall not unreasonably deny.

**B.**    Any Action shall be prosecuted solely at the cost and expense of the party bringing the Action. With respect to any Action brought by LICENSOR, all sums recovered, whether by judgment, settlement or otherwise, shall belong exclusively and entirely to LICENSOR. In the event LICENSEE brings an Action, all sums recovered, whether by judgment, settlement or otherwise, in excess of the amount of reasonable attorneys' fees actually paid to counsel for the party bringing the Action and other out of pocket expenses incurred in such Action, shall be divided equally between LICENSOR and LICENSEE.

**C.**    Upon the reasonable request of the party bringing the Action, the other party shall execute all papers, testify on all matters, and otherwise cooperate in every way necessary and desirable for the prosecution of any such Action, including consenting to joinder in the Action. The party bringing suit shall reimburse the other party for the reasonable expenses incurred as a result of such cooperation.

## 12.    REPRESENTATIONS AND WARRANTIES

**A.**    Notwithstanding anything to the contrary herein, LICENSOR makes no representations or warranties concerning its ownership of copyrights or any other rights in the Artworks, nor with respect to the Trademarks, other than that, as of the Effective Date, it owns the trademark registrations listed in Exhibit A to this Agreement. LICENSEE acknowledges that third parties may own rights in or appurtenant to one or more of the Artworks, and that LICENSEE's use of the Artworks is at its own risk. LICENSOR agrees, however, that LICENSOR will not challenge LICENSEE on the ground that LICENSEE's reproduction of Artworks on Licensed Products or in connection with the advertising or promotion of Licensed Products, or LICENSEE's distribution of Licensed Products on which Artworks appear, infringes any copyrights that LICENSOR might own in the Artworks.

**B.**    Each of the parties represents and warrants to the other that it has the legal right, authority and capacity to enter into this Agreement and to make the covenants made in this Agreement, and that there is no other agreement, and that it will not during the term of this Agreement enter any other agreement, in conflict herewith.

## 13.    INDEMNITY

LICENSEE agrees to defend, hold harmless and indemnify LICENSOR, its officers, directors, agents and employees, against all costs, expenses and losses (including reasonable attorneys' fees and costs) that arise from claims of third parties against LICENSOR that relate to either LICENSEE's or a Sublicensees' use of the Trademarks, Artworks or that relate to Licensed Products or LICENSEE's actions within the scope of this Agreement or a Sublicensee's actions within the scope of a Merchandising Sublicense. LICENSEE shall ensure that each Merchandising Sublicense shall similarly provide indemnification to LICENSOR.

## 14.    INSURANCE

LICENSEE shall, throughout the Term of the Agreement, obtain and maintain at its own cost and expense from a qualified insurance company licensed to do business in New York, standard Product Liability Insurance naming LICENSOR as an additional named insured. Such policy shall provide coverage in the amount of $5 million, and protection against any and all

claims, demands and causes of action covered by the indemnification provisions of this Agreement, including without limitation those arising out of any breach by LICENSEE of the terms of this Agreement, claims of infringement or other violations concerning the Trademarks or Artworks, defects or failure to perform, alleged or otherwise, of the Licensed Products or any material used in connection therewith or any use thereof. The policy shall obligate the insurer to provide notice to LICENSOR by Registered or Certified Mail, return receipt requested, within ten (10) days in the event of any modification, cancellation or termination thereof. LICENSEE agrees to furnish LICENSOR a certificate of insurance evidencing same within thirty (30) days after execution of this Agreement. Each of the Merchandising Sublicenses shall contain similar insurance provisions applicable to each Sublicensee, with appropriate coverage limits as approved in advance by LICENSOR.

## 15.    FORCE MAJEURE

It is understood and agreed that in the event of an act of the government, or war conditions, or fire, flood or labor trouble in the factory of LICENSEE or a Sublicensee, or in the factory of those manufacturing parts necessary for the manufacture of the Licensed Products, prevent the performance by LICENSEE of the provisions of this Agreement, then such nonperformance by LICENSEE shall not be considered as grounds for breach of this Agreement and such nonperformance shall be excused while the conditions herein prevail and for two (2) months thereafter.

## 16.    JURISDICTION & DISPUTES

**A.**    This Agreement shall be governed in accordance with the laws of the State of Massachusetts.

**B.**    All disputes under this Agreement shall be resolved by the courts located in the State of Massachusetts located in Boston, Massachusetts, including the United States District Court for the District of Massachusetts, and each of the parties consents to the jurisdiction of such courts, agrees to accept service of process by mail, and hereby waives any jurisdictional or venue defenses otherwise available to it.

## 17.    ASSIGNMENT/AGREEMENT BINDING ON SUCCESSORS

The provisions of the Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their heirs, administrators, permitted successors and permitted assigns. Any assignment of this Agreement by LICENSEE shall be subject to the express written approval of LICENSOR, which approval shall not unreasonably be withheld. For the purposes of this Section, a change of control of LICENSEE shall be deemed an assignment requiring LICENSOR's express written approval. Any assignment by LICENSEE in violation of this provision shall be considered null and void from its inception.

## 18.    WAIVER

No waiver by either party of any default shall be deemed as a waiver of prior or subsequent default of the same or other provisions of this Agreement.

13

19.    **SEVERABILITY**

If any term, clause or provision hereof is held invalid or unenforceable by a court of competent jurisdiction, such invalidity shall not affect the validity or operation of any other term, clause or provision and such invalid term, clause or provision shall be deemed to be severed from the Agreement.

20.    **NO JOINT VENTURE**

Nothing contained herein shall constitute this arrangement to be an employment, a joint venture or a partnership, or to create an agency relationship.

21.    **INTEGRATION**

This Agreement constitutes the entire understanding of the parties, and revokes and supersedes all prior agreements between the parties (including, without limitation, the Merchandising License Agreement with an effective date of September 2, 2005 between LICENSOR and LICENSEE's predecessor, Machine Ltd.), including any option agreements that may have been entered into between the parties, and is intended as a final expression of their agreement concerning the subject matter hereof.  This Agreement shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement.  This Agreement shall take precedence over any other documents that may be in conflict with this Agreement.

**IN WITNESS WHEREOF**, the parties hereto, intending to be legally bound hereby, have executed this Merchandising License Agreement on the date indicated below, effective as of the Effective Date.

**PAN AMERICAN WORLD AIRWAYS, INC.**    **MACHINE PROJECT, INC.**

By: _____    By: _____

Title: Senior VP General Counsel    Title: 4. _____

Date: 7·20·07    Date: 4.20.07

Date: _____    Date: _____

Approved as to termination of agreement with Machine, Ltd.

14

## EXHIBIT A

<u>Trademarks</u>:
**[To be supplemented with schedule of registrations]**







[substitute PAA AND WING logo (logo to side)]

*PAN AMERICAN WORLD AIRWAYS*

15

## EXHIBIT B

Merchandising Products:

Luggage, travel bags, tote bags

Accessories, namely umbrellas, hats, belts, sun glasses

Apparel

Footwear

Watches, jewelry

Model airplanes (excluding 1:400 scale model aircraft)

Stationery, calendars, note cards, posters, prints

Memorabilia, namely, art plates, ornaments, toys, coffee mugs, towels Travel accessories, namely, locks, toiletries

Home and housewares including bedding and bathroom goods

Mineral water and alcoholic/non-alcoholic drinks

Board games, card games, video and electronic games

## EXHIBIT C

Artworks:

**EXHIBIT D**

Territories:

Asia: Means countries including China, Hong Kong, Macau, India, Malaysia, Thailand, Vietnam, Korea, Japan, Singapore, etc. within the Eurasian landmass next to Europe – lying approximately along Urals, the Urals River, the Caspian Sea, The Caucasus, The Black Sea The Bosporus and the Dardanelles straits, and the Aegean Sea, with the Suez Canal as the west boundary, the Bering Strait as the northeast boundary Golf of Aden, the Arabian Sea, and the Bay of Bengal as the South Boundary, the South China Sea, Yellow Sea, The Sea of Japan, The Sea of Okhotsk, and the Bering Sea as the east boundary and the Artic Ocean as the Northern boundary

The Rest of the world besides Germany and the EU.

ANNARBOR 86634v5

**Plaintiff's Exhibit 4**

Machine Ministries Inc.
241 W. 37th Street, Suite 720
New York, NY 10018

To Whom it may concern,
Kinser Chiu is a fifty percent partner in Machine Ltd.

As a partner, Kinser has the authority to work on Machine's behalf with regard to the usage and the sub licensing of the Pan Am trademark, within the parameters of the licensing agreement with Pan Am Airlines.

Sincerely,

Anthony Lucas

**Plaintiff's Exhibit 5**

Yahoo! Mail - kinser.chiu@bluemoe.com

**YAHOO!** SMALL BUSINESS
CLASSIC

Print - Close Window

**To:**      "K.W. CHIU" <kinser.chiu@bluemoe.com>

**From:**    "anthony lucas" <anthony@panamone.com>

**Subject:** PAN AM

**Date:**    Mon, 7 Apr 2008 11:38:18 -0400

Kinser,
I have attempted to contact you several times yesterday and today.

My family has decided not to lend me the money for the inventory.
So, when Stacy called me this morning regarding the seats, I informed
her that we were going to sell the inventory to a discounter,
but we would give Pan am the first option to purchase the goods.

In addition, I would still like to purchase some goods from you so I
can make a living by selling inventory while looking for a job.
If you agree, I can provide you with cash or a cashiers check from my
bank made out to you or to who you want.
Once completed, I would like to pick up the goods from the warehouse
with a UHaul Truck.

A.

**Plaintiff's Exhibit 6**



# Saunders Silverstein & Booth LLP    Attorneys at Law

**Aaron Silverstein**
p. 978.463.9130
f. 978.463.9109
asilverstein@ssbooth.com

April 3, 2008

**Via FedEx**
**(#799830858842)**

Vetements, Inc.
241 West 37th Street
Suite #726
New York, NY 10018
Attn: Suk Fun Lau

Re:    Machine Project/Vetements/Pan Am

Ms. Lau:

This firm represents Anthony Lucas and Machine Project, Inc. ("MPI"). Your letter of March 25, 2008, to Mr. Lucas has been forwarded to us for a response.

As you are aware, MPI is the exclusive worldwide licensee of various PAN AM trademarks (the "Marks") for use on a number of consumer goods. In its March 4, 2008 letter to you, MPI expressly terminated all rights granted to Vetements, Inc. ("Vetements") under the January 14, 2008 "Letter of Authorization" with respect to the manufacture, distribution and sale of goods bearing the Marks. For the avoidance of doubt, any rights granted to Vetements under the "Letter of Authorization" are hereby terminated. Consequently, any further manufacture, distribution. or sales by Vetements of goods bearing any of the Marks shall constitute breach of contract, infringement of MPI's trademark rights in the Marks as an exclusive licensee, and a violation of federal law under the Lanham Act and various state laws.

In your March 25, 2008 letter, you claim that Vetements is a business partner of MPI, and cite to a "Chronological Summary of Events" as evidence of this partnership. However, no such "Chronological Summary of Events" is attached to the letter. In the event that such summary exists it has no bearing on the actual relationship between MPI and Vetements. Assuming for the sake of argument that there was a contractual "partnership" between MPI and Vetements, any such partnership was terminated by MPI's March 4, 2008 termination letter.

Suk Fun Lau
Vetements, Inc.
April 4, 2008
Page 2

You further assert that Mr. Lucas is not authorized to act on behalf of MPI. To the contrary, Mr. Lucas is the President and sole shareholder of MPI. Mr. Lucas therefore has full and exclusive authority to represent and enforce the interests and rights of MPI, and to terminate the rights granted to Vetements under the January 14, 2008 "Letter of Authorization".

On behalf of our clients, we hereby demand that you immediately cease and desist all further manufacture, distribution, promotion, and sale of goods bearing the Marks, or any similar variation thereof. Additionally, we hereby demand that you deliver to MPI, at Vetements' sole expense, all goods bearing the Marks which are in Vetements' possession or under its control.

We wish to receive your assurances in writing by noon on Wednesday, April 9, 2008 that you will comply with the above demands. If you fail to advise us by then that you will comply with the above demands, our clients shall, without further notice to you, take such steps as may be necessary to assert their rights including to seek injunctive relief, recover profits, multiple damages and costs (including reasonable attorney fees), and otherwise protect its interests.

Please note, our clients would sincerely prefer an amicable resolution to this matter. Your cooperation will certainly be appreciated by our clients and will be a factor in how far Mr. Lucas and MPI will need to press this matter.

This letter is not intended to constitute a complete or exhaustive statement of all facts, rights, claims, or defenses relating to this matter, and is neither intended to be nor should be construed as a waiver, release or relinquishment of any of our clients' rights, remedies, or defenses available to it whether legal or equitable, all of which are hereby expressly reserved.

Very truly yours,

Aaron Silverstein

cc: Anthony Lucas (via email)

**Plaintiff's Exhibit 7**

# PAN AM SYSTEMS, INC.

Pease International Tradeport
14 Aviation Avenue
Portsmouth, NH 03801

---

**LAW DEPARTMENT**
**(603) 766-2002**

April 28, 2008

Raymond W.M. Chin, Esq.          **By Fax (212) 406-2271**
Attorney at Law                  **and Express Mail**
305 Broadway, Suite 305
New York, NY 10007

      **Re:    Kinser Chiu**

Dear Attorney Chin:

      Please accept this letter in response to your correspondence of April 11, 2008 requesting clarification of the understanding of Pan American World Airways, Inc. ("Pan Am") as to Mr. Chiu's interest, if any, in Machine Project, Inc. ("Machine"). In response, I can assure you that Pan Am has inquired as to any interest that Mr. Chiu may have in Machine, as recently as last week when you and I spoke via telephone. Despite these inquiries, no documentation has been produced to date to support any claim that Mr. Chiu might have some form of interest in Machine, and therefore Pan Am has no choice but to rely upon the assertions made by Mr. Anthony Lucas, President of Machine, that Mr. Chiu in fact has no such interest. Nevertheless, if documentation does exist evidencing that Mr. Chiu does indeed have an interest in Machine, I am once again requesting that you forward that documentation to my attention at your earliest convenience. Pan Am will then review what is provided and respond accordingly.

      Notwithstanding the foregoing, however, the issue of whether or not Mr. Chiu has an ownership interest in Machine is irrelevant for purposes of the Notice of Termination of the Merchandising License Agreement (the "Agreement") sent by Pan Am to Machine on March 14, 2008. Specifically, pursuant to Section 9.A of the Agreement, notice was to be sent to Machine at its New York address to be effective, and there is no requirement that individual shareholders or interest holders also receive a copy of any notices. Therefore, regardless of whether Mr. Chiu has an interest in Machine, as between Pan Am and Machine, notice of termination was properly given and is effective.

Finally, you have also requested a copy of the Agreement and the above-referenced notice of termination. In response, I would suggest that you contact Mr. Lucas for these documents, as he is, to the best of our knowledge, the President of Machine.

Thank you for your attention to this matter. Please feel free to contact me if you should have any questions or comments.

Sincerely,

Robert B. Culliford
Senior Vice President &
General Counsel

SUPREME COURT OF THE STATE OF NEW YORK    Index No. Purchased
COUNTY OF NEW YORK                                                      2008

---

KINSER CHIU and MACHINE PROJECT, INC.

                                              Plaintiffs,

                                                                       AFFIRMATION IN
                                                                       SUPPORT OF
                                                                       ORDER TO SHOW
                            -against-                                  CAUSE

ANTHONY LUCAS and PAN AM SYSTEMS, INC.,

                                              Defendants

---

RAYMOND W M CHIN, an attorney duly admitted to practice before the courts of this state affirms the following to be true under penalties of perjury:

1] I am the attorney for plaintiffs in this action and have personal knowledge of the matter herein set forth. I submit this affirmation in support of plaintiffs' application for an order enjoining defendants, pendente lite, from any actions inconsistent with the continuing validity of the January 1, 2007 agreement between plaintiff Machine Projects, Inc. or, alternatively, interfering with Machine Project's continuing fulfillment of orders solicited and placed thereunder as well as their denying recognition of plaintiff Chiu as an officer and representative of Machine Project, Inc.

2] The underlying facts are set forth in the accompanying affidavit of plaintiff, Chiu submitted herewith. In this affirmation I wish only to corroborate the fact that I recently had a telephone conversation with Robert Culliford, Esq. , general counsel and senior vice president of Pan Am Systems, Inc., following correspondence between us (copies annexed as Exhibits 1 and 2) in which I requested advise of the nature of the defaults he (or Pan Am) alleged Machine

Project, Inc. had committed. He responded that they were too numerous to mention and advised that one of them was the failure to meet the minimum performance required of Machine Project, Inc. When I inquired if there would be an opportunity to remedy any such default, he replied in the negative. The impression I was left with, following that conversation, was that it was Pan Am's intent, following termination of the agreement with Machine, to continue the same business with defendant Lucas but on more favorable terms..

3] No prior application for his relief has been made.

Affirmed  May    2008
      New York, New York

                                                      RAYMOND W M CHIN

**Exhibit 1**

# PAN AM SYSTEMS, INC.

Pease International Tradeport
14 Aviation Avenue
Portsmouth, NH 03801

April 10, 2008

Raymond W. M. Chin, Esq.
305 Broadway, Suite 305
New York, NY 10007

Dear Mr. Chin:

I am in receipt of your letter addressed to the attention of Ms. Stacy Beck inquiring into the status of a certain License Agreement by and between Pan American World Airways, Inc. ("Pan Am") and Machine Project, Inc. ("Machine"). While I appreciate Mr. Chiu's continued interest in the success of Pan Am's branding program, I am somewhat confused by your purported representation of Machine, a company that to the best of our knowledge is wholly owned by Mr. Lucas. Accordingly, Pan Am does not believe that Mr. Chiu is in a position to correct the numerous defaults that have occurred pursuant to the Agreement, and I must therefore decline your request to provide you with the information you request.

Nevertheless, Pan Am is aware that Mr. Chiu is in possession of merchandise that was manufactured pursuant to authority granted by Machine in early 2008, and that this authority did not extend to a sale of the merchandise to anyone other than Machine, as Pan Am's licensee. or Pan Am as owner of the relevant intellectual property. Consequently, please accept this letter as a demand that Mr. Chiu provide Pan Am with an offer to purchase these goods at no more than fair market value within three (3) days of receipt of this letter, as well as proposed dates for inspection and possible delivery of the merchandise. Furthermore, please be advised that if Mr. Chiu declines to abide by this demand, Pan Am reserves all of its rights to pursue appropriate remedies to prevent any unauthorized sale of this merchandise to third parties.

Thank you for your attention to this matter. Please feel free to contact me if you should have any questions or comments.

Sincerely,

Robert B. Culliford
Senior Vice President &
General Counsel

**Exhibit 2**

**RAYMOND W. M. CHIN**
**Attorney At Law**
**305 Broadway, Suite 305**
**New York, N.Y. 10007**
**Tel.: (212) 406-2240**
**Fax: (212) 406-2271**

ADMITTED IN NY & NJ

April 11, 2008

Robert B. Culliford, Esq.    *63766 2000*
Senior Vice President & General Counsel
Pan Am Systems, Inc.
14 Aviation Avenue
Portsmouth, NH 03801

Re: Machine Project, Inc. with Pan Am

Dear Mr. Culliford:

We received your letter of April 10 a few moments ago and were quite take aback by its contents and tenor. We hereby represent to you that we have been retained by Mr. Chiu to act on behalf of him and Machine Project, Inc.

Unless we misunderstand it, your position is that you have unilatteraly determined that:

1] Our client is not an owner, principal or shareholder of Machine Project, Inc. and that you are not interested in seeing documentary evidence to the contrary, and

2] Machine Project, Inc. is in default in so many (heretofore undisclosed) ways under its licensing agreement with your company that it is unnecessary to specify the nature of the defaults or provide with a list of them, a copy of any notice of default or an opportunity to cure.

In view of these facts it is apparent we have no recourse except to advise our client that in our opinion litigation is his only available option - advise we are most reluctant to give in the ordinary course. If we have mis-understood your position, please advise and we would be pleased to discuss other available options with you.

Very truly yours,

RAYMOND W. M. CHIN

RWMC/m

E



## NOTICE OF
## ANNUAL MEETING OF SHAREHOLDERS
OF _Machine Project Inc._

Pursuant to Article II, Section 1 of the Bylaws of Name of Company , notice is hereby given that the annual meeting of the Shareholders will be held at _8pm_ (time), on _May 25,07_ (date), at the following location:

_Anthony Lukas_
_Mary Beth Brenberg_
_125 Buckingham Ave_
_Trenton, NJ 08618_

to consider and act on the following:

1.   The election of directors, and
2.   The transaction of such other business as may properly come before the meeting.

If you do not expect to be present at the meeting and wish your shares to be voted, you may so proxy your votes in accordance with Article II, Section 6 of the Bylaws.

Date:_____

_____
Authorized Officer

Sample provided by
**quickinc**

### MINUTES OF THE ANNUAL
### SHAREHOLDER MEETING
### OF NAME OF COMPANY

Having present or by proxy a sufficient number of Shareholders to constitute a quorum, the Shareholders of the above named Company held an annual meeting at:

Date: _May 25 2006_   Time: _5pm_

Place: _125 Buckingham Ave Trenton, NJ_

Having been presented with sufficient information and upon further discussion and consideration, the Shareholder resolved as follows:

(a) that the financial statements presented to the Shareholders are herby approved and adopted;

(b) the following persons are hereby elected the Directors of the Corporation for the next ensuing year or until their successors are elected:



_Anthony Lukas_

_Mary E Barenberg_ , and

_____ ;

(c) that all acts, contracts, by-laws, resolutions, proceedings, appointments, elections and payments enacted, taken passed, made and done by the directors and officers of the Corporation since the last annual meeting to the date of this meeting are approved and confirmed.

There being no further business to come before the meeting, the meeting was duly adjourned.



Authorized Officer

Date: _5/25/2006_

_____

Authorized Officer

Sample provided by
**quickinc**

## CONSENT OF SHAREHOLDERS TO
## SUB S ELECTION

OF _Machine Project inc._

The undersigned, being all of the shareholders of the above named corporation, hereby consent that the corporation seek to qualify as a small business corporation under Sub Chapter S of Internal Revenue Code Section 1362.

_Mary E Bomberg_

Date: _5-25-2006_

Sample provided by
**quickinc**

F

05/16/2008 15:51 FAX 281 293 7375          QUICK INC CORP                                    ☑004

F060517000**284**

Incorporator Information Required

*(Signature)*

**Anthony Lucas**
*(Type or print name)*

**125 Buckingham Avenue**
*(Address)*

**Trenton, NJ 08618**
*(City, State, Zip code)*

FILED
2006 MAY 17  AM 10:36

# CERTIFICATE OF INCORPORATION
## OF
## Machine Project Inc.

Under Section 402 of the Business Corporation Law

Filed By:    The Quick Inc Corporation
             16000 Barkers Point Lane
             Suite 220
             Houston, TX  77079

l c c
STATE OF NEW YORK
DEPARTMENT OF STATE

FILED   MAY 1 7 2006
TAX $    1 0 . 0 0
BY _____ L A P

N E W Y

3 0 9



*State of New York   }*
*Department of State }*  *ss:*

*I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.*

*Witness my hand and seal of the Department of State on*    **May 17, 2006**



*Special Deputy Secretary of State*

DOS-1266 (Rev. 11/05)

Attn Rob

NY Department Of State / Division of Corporations
41 State Street
Albany, NY 12231-0001

To whom it may concern,
I am requesting a Certificate of Good Standing for Machine Project Incorporated.
I have enclosed the credit card authorization. If you should have any questions,
please call me at 212-991-0830.

Thank you and have a great day.

Sincerely

Anthony Lucas
**Machine Project Inc.**
241 W. 37th Street
New York, NY 10018

NYS Department of State
DIVISION OF CORPORATIONS

## *Credit Card/Debit Card Authorization*

41 State Street
Albany, NY 12231-0001
www.dos.state.ny.us

Attach this form to your document or written request.

The Department of State's Division of Corporations accepts MasterCard, Visa, American Express and Diners Club for payment of certain fees.

## Name of Corporation or Other Business Entity To Which This Service Request Applies:

*Machine Project Inc.*

### Check Box for Requested Service:

Fill in Fee or Amount:

☒ FILING OF DOCUMENTS AND CERTIFICATES

(Please consult the appropriate fee schedule for specific filing fees) ____

*Optional Expedited Service:    ☒ 24 hour-$25    ☐ Same day-$75    ☐ 2 hour-$150    $ ____

☐ CERTIFIED COPY ($10 each) ____    $ ____

*Optional Expedited Service:    ☐ 24 hour-$25    ☐ Same day-$75    ☐ 2 hour-$150    $ ____

☐ PLAIN COPY ($5 each) ____    $ ____

*Optional Expedited Service:    ☐ 24 hour-$25    ☐ Same day-$75    ☐ 2 hour-$150    $ ____

☒ CERTIFICATE UNDER SEAL (Certificates of Good Standing, etc. ($25 each)) ____    $ *25.*

*Optional Expedited Service:    ☒ 24 hour-$25    ☐ Same day-$75    ☐ 2 hour-$150    $ *25.*

☐ SERVICE OF PROCESS (Must be served in person at the above address) ____    $ ____

☐ BIENNIAL/FIVE YEAR STATEMENT ____    $ ____

☐ OTHER ____    $ ____

☐ DEPOSIT TO DRAWDOWN ____    $ ____

Account Name: ____
Account Number: ____

TOTAL (Total Amount due)    $ *50.00*

**\* Same day expedited service requests must be received by 12 noon.**

**2 hour expedited service requests must be received by 2:30 p.m.**

Expedited service fees are non-refundable and will not be refunded if a filing is rejected.

MasterCard ☐    Visa ☐    American Express ☒    Diners Club ☐

Card number:    |3|7|1|1|9|    |3|7|9|5|    |0|1|2|5|    |0|1|7|1|

Expiration Date: (Month and Year) ____ *03/10*

*Anthony M Lucas*

Name as it Appears on the Credit Card or Debit Card (Print)

*125 Buckingham Ave, Trenton, NJ 08618*

Cardholder's Billing Address as Listed with Credit Card or Debit Card Company

City ____    State ____    Zip Code+4 ____

**Cardholder's Signature** ____    Date *2·6·07*

If the name on the credit card or debit card is in the name of a corporation or other business entity, please print the signer's name:

____

Daytime telephone number:

|2|1|2| - |9|9|1| - |0|8|3|0|

Fax number:

|2|1|2| - |3|9|1| - |5|4|5|8|

# State of New York
# Department of State } ss:

I hereby certify, that the Certificate of Incorporation of MACHINE PROJECT INC. was filed on 05/17/2006, with perpetual duration, and that a diligent examination has been made of the Corporate index for documents filed with this Department for a certificate, order, or record of a dissolution, and upon such examination, no such certificate, order or record has been found, and that so far as indicated by the records of this Department, such corporation is an existing corporation.

*** 

*WITNESS my hand and the official seal of the Department of State at the City of Albany, this 07th day of February two thousand and seven.*

*200702080224  59*

*Special Deputy Secretary of State*

*ANTHONY LUCAS*
*MACHINE PROJECT INC*
*241 W 37TH ST*
*NEW YORK NY 10018*

*Enclosed is the information you requested. Your payment of $50.00 is hereby acknowledged.*

*If the name on the enclosed document(s) does not match exactly with the name of the entity you requested, this office does not have a record of the exact name you requested. The document(s) provided appear(s) to be of sufficient similarity to be the entity requested.*

*200702080224  59*

G

## MINUTES OF THE REGULAR
## DIRECTOR MEETING
OF _Machine Project_

The Directors of the above named Company held an annual meeting at:

Date: _May 25 2006_    Time: _8 pm_

Place: _125 Buckingham Ave Trenton NJ_

The following directors were present at the meeting:

_Anthony Lukas_

_Mary E. Barunborg_

The chairman called the meeting to order and announced that the meeting was held pursuant to the bylaws of the corporation.

It was then moved and resolved to dispense with the reading of the minutes of the last meeting.

The Directors considered the election of officers to serve until the next annual meeting of directors. The directors unanimously voted to elect the following persons to the corresponding positions:

President: _Anthony Lukas_

Treasurer: _Mary E Barunborg_

Secretary: _Anthony Lukas_

There being no further business to come before the meeting, the meeting was duly adjourned.

_____
Authorized Officer

Date: _5-25-2006_

_Mary E Barunborg_
Authorized Officer

Sample provided by
**quickinc**

# MINUTES OF FIRST MEETING
## OF
_Machine Project inc._
## BOARD OF DIRECTORS

The first meeting of the board of directors was held at _____ on the 25 day of _May_ , 20 _06_.

Present were: _Anthony Lukas_ , acting as Chairman, _Mary E Barenborg_ constituting a quorum of the board.

The Articles of Incorporation of the Corporation were filed in the office of the Secretary of State on _May 17_ , _2006_. A copy of the Articles of Incorporation has been inserted in the Minute Book of the Corporation.

RESOLVED FURTHER: That _Anthony Lukas_, named as this corporation's registered agent in the Articles of Incorporation, is hereby confirmed in such capacity.

RESOLVED FURTHER: That the corporate seal in the form, words, and figures impressed upon the last page of these minutes be, and it hereby is, adopted as the seal of the corporation.

RESOLVED FURTHER: That the form of stock certificates present to the board be, and it hereby is, approved and adopted, and the Secretary of the Corporation is directed to insert a specimen certificate in the Minute Book immediately following these minutes.

RESOLVED FURTHER: That _Anthony Lukas_, be, and the same hereby is, designated and fixed as the principal executive office for the transaction of the business of this corporation.

RESOLVED FURTHER: That the following persons were unanimously elected to the offices and at the annual salaries respectively set forth:

| TITLE | NAME | SALARY |
|---|---|---|
| President | _Anthony Lukas_ | $0 |
| Treasurer | _Mary Barenborg_ | $0 |
| Secretary | _Anthony Lukas_ | $0 |

RESOLVED FURTHER: That the fiscal year of this corporation shall end on December 31 of each year.

RESOLVED FURTHER: That the officers of the corporation are authorized and directed to pay the expenses of its incorporation and organization, including effecting reimbursement to any persons who have advanced funds to the corporation for such purposes and payment of any amounts remaining owing to the corporation's attorney and accountant for services in connection therewith.

RESOLVED FURTHER: That all contracts and transactions entered into on behalf of and for the benefit of this corporation, be and they hereby are accepted, adopted and ratified by this corporation; and

Sample provided by
**quickinc**

RESOLVED FURTHER: That this corporation save, defend, indemnify and hold harmless the persons who entered into said contracts and transactions on behalf and for the benefit of this corporation, from and against any liability or expense arising therefrom and thereunder.

RESOLVED FURTHER: That the officers of this corporation be, and they hereby are, authorized to sell and issue to the following persons the number of shares of capital stock of this corporation and for the consideration indicated opposite each name:

| NAME | NUMBER OF SHARES | $ PER   SHARE | TYPE AND AMOUNT OF CONSIDERATION |
|---|---|---|---|
| Anthony Lukas | 200 | $0.01 | |
| | | | |
| | | | |

RESOLVED FURTHER: That such shares shall be sold without the publication of any advertising or general solicitation.

RESOLVED FURTHER: That said shares shall be sold and issued only under exemption from both federal and state securities laws: the officers and directors of this corporation shall take such action as may be necessary or desirable to effect such exemption, and the corporation's shares shall be issued in accordance with the conditions thereof.

DATE: May 25, 2006

Meeting Chairman

Sample provided by
quickinc

### MINUTES OF THE SPECIAL
### MEETING OF DIRECTORS
OF _Machine Project inc_

All of the directors of the above named corporation having consented to the time and place of the special meeting of the Directors was held on:

Date: _May 25, 2006_    Time: _8 pm_

Place: _125 Buckingham Ave Trenton NJ_

#### Item I

The first item of business that was taken up was the waiver of notice. The waiver, having been signed by all of the Directors, was read aloud by the Chairman and was ordered to be made a part of the minutes.

#### Item II

The Chairman stated that the purpose of the meeting was that the shareholders have executed written consents to treat the corporation as a small business corporation. Upon motion, seconded, and carried it was RESOLVED that the President of the corporation is authorized to execute such documents as is necessary to qualify the corporation as a small business corporation under Sub Chapter S of the Internal Revenue Code Section 1362.

There being no further business to come before the meeting, the meeting was duly adjourned.

_____
Authorized Officer

Date: _5-25-2006_

# BYLAWS
# OF
" _Machine Project_ "
## Incorporated in the State of ___NY___

### ARTICLE I - OFFICES

The principal office of the Corporation shall be located at _125 Buckingham Ave Trenton_ , _New Jersey_ zip code _08618_ and it may be changed from time to time by the Board of Directors. The Corporation may also maintain offices at other places within or without the state of ___NY___ or the United States as the Board of Directors may from time to time, determine.

### ARTICLE II - MEETINGS OF STOCKHOLDERS

**SECTION 1 - ANNUAL MEETINGS:**

The annual meeting of the stockholders of the Corporation shall be held within six (6) months after the close of the fiscal year of the Corporation, for the purposes of electing directors, and transacting such other business as may properly come before the meeting.

**SECTION 2 - SPECIAL MEETINGS:**

Special meetings of the stockholders may be called at any time by the Board of Directors or by the President, and shall be called by the President or the Secretary at the written request of the holders of twenty-five percent (25%) of the shares then outstanding and entitled to vote thereat, or as otherwise required by law.

**SECTION 3 - PLACE OF MEETINGS:**

All meetings of stockholders shall be held at the principal office of the Corporation, or at such other places as shall be designated in the notices or waivers of notice of such specific meetings.

**SECTION 4 - NOTICE OF MEETINGS:**

(a)	Except as otherwise provided by statute, written notice of each meeting of stockholders, whether annual or special, stating the time when and place where it is to be held, shall be served

either personally or by mail, not less than ten or more than sixty (60) days before the meeting, upon each stockholder of record entitled to vote at such meeting, and to any other stockholder to whom the giving of notice may be required by law. Notice of a special meeting shall also state the purpose or purposes for which the meeting is called, and shall indicate that it is being issued by, or at the direction of, the person or persons calling the meeting. If, at any meeting, action is proposed to be taken that would, if taken, entitle stockholders to receive payment for their shares pursuant to statute, the notice of such meeting shall include a statement of that purpose and to that effect. If mailed, such notice shall be directed to each such stockholder at his address, as it appears on the records of the stockholders of the Corporation, unless he shall have previously filed with the Secretary of the Corporation a written request that notices intended for him be mailed to some other address, in which case, it shall be mailed to the address designated in such request.

(b)    Notice of any meeting need not be given to any person who may become a stockholder of record after the mailing of such notice and prior to the meeting, or to any stockholder who attends such meeting, in person or by proxy, or submits a signed waiver of notice either before or after such a meeting. Notice of any adjourned meeting of stockholders need not be given, unless otherwise required by statute.

## SECTION 5 - QUORUM

(a)    Except as otherwise provided herein, or by statute, or in the Articles of Incorporation (such articles and any amendments thereof being hereinafter collectively referred to as the "Articles of Incorporation"), at all meetings of stockholders of the Corporation, the presence at the commencement of such meetings in person or by proxy of stockholders holding of record 50% of the total number of shares of the Corporation then issued and outstanding and entitled to vote, shall be necessary and sufficient to constitute a quorum for the transaction of any business. The withdrawal of any stockholder after the commencement of a meeting shall have no effect on the existence of a quorum, after a quorum has been established at such meeting.

(b)    Despite the absence of a quorum at any annual or special meeting of stockholders, the stockholders, by a majority of the votes cast by the holders of shares entitled to vote thereat, may adjourn the meeting. At any such adjourned meeting at which a quorum is present, any business, may be transacted at the meeting as originally called if a quorum had been present.

## SECTION 6 - VOTING:

(a)    Except as otherwise provided by statute or by the Articles of Incorporation, any corporate action, other than the election of directors, to be taken by vote of the stockholders, shall be

Sample provided by  *quickinc*

2

authorized by a majority of votes cast at a meeting of stockholders by the holders of shares entitled to vote thereat.

(b)     Except as otherwise provided by statute or by the Articles of Incorporation, at each meeting of stockholders, each holder of record of stock of the Corporation entitled to vote thereat, shall be entitled to one vote for each share of stock registered in his name on the books of the Corporation.

(c)     Each stockholder entitled to vote or to express consent or dissent without a meeting, may do so by proxy; provide, however, that the instrument authorizing such proxy to act shall have been executed in writing by the stockholder himself or by his attorney-in-fact thereunto duly authorized in writing. No Proxy shall be valid after the expiration of eleven (11) months from the date of its execution, unless the person executing it shall have specified therein the length of time it is to continue in force. Such instrument shall be exhibited to the Secretary at the meeting and shall be filed with the minutes of the meeting.

(d)     Any action, except election of directors, which may be taken by a vote of stockholders at a meeting, may be taken without a meeting if authorized by a written consent of shareholders holding at least a majority of the voting power, provided that if a greater proportion of voting power is required by such action at such meeting, then such greater proportion of written consents shall be required.

## ARTICLE III - BOARD OF DIRECTORS

## SECTION 1 - NUMBER, ELECTION AND TERM OF OFFICE:

(a)     The number of the directors of the Corporation shall be not less than 1 nor more than 9, unless and until otherwise determined by vote of a majority of the entire Board of Directors. The number of Directors shall not be less than three (3), unless all of the outstanding shares of stock are owned beneficially and of record by less than three (3) stockholders, in which event the number of directors shall not be less than the number of stockholders or the minimum permitted by statute.

(b)     Except as may otherwise be provided herein or in the Articles of Incorporation by way of cumulative voting rights the members of the Board of Directors of the Corporation, who need not be stockholders, shall be elected by a majority of the votes cast at a meeting of stockholders, by the holders of shares of stock present in person or by proxy, entitled to vote in the election.

(c)     Each director shall hold office until the annual meeting of the stockholders next succeeding his election, and until his successor is elected and qualified, or until his prior death, resignation or removal.

## SECTION 2 - DUTIES AND POWERS

The board of directors shall be responsible for the control and management of the affairs, property and interests of the corporation and may exercise all powers of the corporation, except as are in the Articles of Incorporation or by statute expressly conferred upon or reserved to the stockholders.

## SECTION 3 - ANNUAL AND REGULAR MEETINGS; NOTICE:

(a)     Regular annual meeting of the Board of Directors shall be held immediately following the annual meeting of the stockholders, at the place of such annual meeting of stockholders.

(b)     The board of directors, from time to time, may provide by resolution for the holding of other regular meetings of the Board of Directors, and may fix the time and place thereof.

(c)     Notice of any regular meeting of the Board of Directors shall not be required to be given and, if given, need not specify the purpose of the meeting; provided, however, that in case the Board of Directors shall fix or change the time or place of any regular meeting, notice of such action shall be given to each director who shall not have been present at the meeting at which such change was made within the time limited, and in the manner set forth in Paragraph (b) section 4 of this Article III, with respect to special meetings, unless such notice shall be waived in the manner set forth in Paragraph (c) of such Section 4.

## SECTION 4 - SPECIAL MEETING; NOTICE:

(a)     Special meetings of the Board of Directors shall be held whenever called by the President or by one of the directors, at such time and place as may be specified in the respective notices or waivers of notice thereof.

(b)     Except as otherwise required by statute, notice of special meetings shall be mailed directly to each director, addressed to him at his residence or usual place of business, at least four (4) days before the day on which the meeting is to be held, or shall be sent to him at such place by telegram, radio or cable, or shall be delivered to him personally or given to him at such place by telegram, radio or cable, or shall be delivered to him personally or given to him orally, not later than the day before the day on which the meeting is to be held. A notice, or waiver of notice except as required by Section 8 of this Article III, need not specify the purpose of the meeting.

(c)     Notice of any special meeting shall not be required to be given to any director who shall attend such meeting without protesting prior thereto or at its commencement, the lack of notice to him or who submits a signed waiver of notice, whether before or after the meeting. Notice of any adjourned meeting shall not be required to be given.

## SECTION 5 - CHAIRMAN:

At all meetings of the Board of Directors, the Chairman of the Board, if any and if present, shall preside. If there shall be no Chairman, or he shall be absent, then the Vice Chairman shall preside, and in his absence, a Chairman chosen by the directors shall preside.

## SECTION 6 - QUORUM AND ADJOURNMENTS:

(a)    At all meetings of the Board of Directors, the presence of a majority of the entire Board shall be necessary and sufficient to constitute a quorum for the transaction of business, except as otherwise provided by law, by the Articles of Incorporation, or by these Bylaws.

(b)    A majority of the directors, present at the time and place of any regular or special meeting, although less than a quorum, may adjourn the same from time to time without notice, until a quorum shall be present.

## SECTION 7 - MANNER OF ACTING:

(a)    At all meetings of the Board of Directors, each director present shall have one vote, irrespective of the number of shares of stock, if any, which he may hold.

(b)    Except as otherwise provided by statute, by the Articles of Incorporation, or by these Bylaws, the action of a majority of the directors present at any meeting at which a quorum is present shall be the act of the Board of Directors.

(c)    Unless otherwise required by amendment to the Articles of Incorporation or statute, any action required or permitted to be taken at any meeting of the Board of Directors or any Committee thereof may be taken without a meeting if a written consent thereto is signed by all the members of the Board or Committee. Such written consent shall be filed with the minutes of the proceedings of the Board or Committee.

(d)    Unless otherwise prohibited by Amendments to the Articles of Incorporation or statute, members of the Board of Directors or of any committee of the Board of Directors may participate in a meeting of such Board or Committee by means of a conference telephone network or a similar communications method by which all persons participating in the meeting can hear each other. Such participation is constituted presence of all of the participating persons at such meeting, and each person participating in the meeting shall sign the minutes thereof, which may be signed in counterparts.

## SECTION 8 - VACANCIES

Any vacancy in the Board of Directors, occurring by reason of an increase in the number of directors, or by reason of the death, resignation, disqualification, removal (unless vacancy created by the removal of a director by the stockholders shall be filled by the stockholders at the meeting at which the removal was effected) or inability to act of any director, or otherwise, shall be filled for the un-

expired portion of the term by a majority vote of the remaining directors, though less than a quorum, at any regular meeting or special meeting of the Board of Directors called for that purpose.

## SECTION 9 - RESIGNATION:

Any director may resign at any time by giving written notice to the Board of Directors, the President, or the Secretary of the Corporation. Unless otherwise specified in such written notice such resignation shall take effect upon receipt thereof by the Board of Directors or such officer, and the acceptance of such resignation shall not be necessary to make it effective.

## SECTION 10 - REMOVAL:

Any director may be removed with or without cause at any time by the affirmative vote of stockholders holding of record in the aggregate at least a majority of the outstanding shares of stock of the Corporation at a special meeting of the stockholders called for that purpose, and may be removed for cause by action of the Board.

## SECTION 11 - SALARY

No stated salary shall be paid to directors, as such, for their services, but by resolution of the Board of Directors a fixed sum and expenses of attendance, if any, may be allowed for attendance at each regular or special meeting of the Board; provided, however, that nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

## SECTION 12 - CONTRACTS:

(a)     No contract  or other transaction between this Corporation and any other corporation shall be impaired, affected or invalidated, nor shall any director be liable in any way by reason of the fact that one or more of the directors of this Corporation is or are interested in, or is a director or officer, or are directors or officers of such other corporations, provided that such facts are disclosed or made known to the Board of Directors, prior to their authorizing such transaction.

(b)     Any director, personally and individually, may be a party to or may be interested in any contract or transaction of this Corporation, and no directors shall be liable in any way by reason of such interest, provided that the fact of such interest be disclose or made known to the Board of Directors prior to their authorization of such contract or transaction, and provided that the Board of Directors shall authorize, approve or ratify such contract or transaction by the vote (not counting the vote of any such Director) of a majority of a quorum, notwithstanding the presence of any such director at the meeting at which such action is taken. Such director or directors may be counted in

determining the presence of a quorum at such meeting. This Section shall not be construed to impair, invalidate or in any way affect any contract or other transaction which would otherwise be valid under the law (common, statutory or otherwise) applicable thereto.

## SECTION 13 - COMMITTEES:

The Board of Directors, by resolution adopted by a majority of the entire Board, may from time to time designate from among its members an executive committee and such other committees, and alternate members thereof, as they may deem desirable, with such powers and authority (to the extent permitted by law) as may be provided in such resolution. Each such committee shall serve at the pleasure of the Board.

## ARTICLE IV - OFFICERS

## SECTION 1 - NUMBER, QUALIFICATIONS, ELECTION AND TERM OF OFFICE:

(a)      The officers of the Corporation shall consist of a President, a Secretary, a Treasurer, or a Secretary-Treasurer, and such other officers, including a Chairman of the Board of Directors, and one or more Vice Presidents, as the Board of Directors may from time to time deem advisable. Any officer other than the Chairman or Vice Chairman of the Board of Directors may be, but is not required to be a director of the Corporation. Any two or more offices may be held by the same person.

(b)      The officers of the Corporation shall be elected by the Board of Directors at the regular annual meeting of the Board following the annual meeting of stockholders.

(c)      Each officer shall  hold office until the annual meeting of the Board of Directors next succeeding his election, and until his successor shall have been elected and qualified or until his death, resignation or removal.

## SECTION 2 - RESIGNATION:

Any officer may resign at any time by giving written notice of such resignation to the board of directors, or to the President or the Secretary of the Corporation. Unless otherwise specified in such written notice, such resignation shall take effect upon receipt thereof by the Board of Directors or by such officer, and the acceptance of such resignation shall not be necessary to make it effective.

## SECTION 3 - REMOVAL:

Any officer may be removed, either with or without cause, and a successor elected by a majority vote of the Board of Directors at any time.

## SECTION 4 - VACANCIES:

A vacancy in any office by reason of death, resignation, inability to act, disqualification or any other cause, may at any time be filled for the un-expired portion of the term by a majority vote of the board of Directors.

## SECTION 5 - DUTIES OF OFFICERS:

Officers of the Corporation shall, unless otherwise provided by the Board of Directors, each have such powers and duties as generally pertain to their respective offices as well as such powers and duties as may be set forth in these Bylaws, or may from time to time be specifically conferred or imposed by the Board of Directors. The President shall be the chief executive officer of the Corporation.

## SECTION 6 - SURETIES AND BONDS:

In case the Board of Directors shall so require any officer, employee or agent of the Corporation shall execute to the Corporation a bond in such sum, and with such surety or sureties as the Board of Directors may direct, conditioned upon the faithful performance of his duties to the Corporation, including responsibility for negligence for the accounting for all property, funds or securities of the Corporation which may come into his hands.

## SECTION 7 - SHARES OF STOCK OF OTHER CORPORATIONS:

Whenever the Corporation is the holder of shares of stock of any other corporation, any right or power of the Corporation as such stockholder (including the attendance, acting and voting at stockholders' meetings and execution of waivers, consents, proxies or other instruments) may be exercised on behalf of the Corporation by the President, any Vice President or such other person as the Board of Directors may authorize.

## ARTICLE V- SHARES OF STOCK

## SECTION 1 - CERTIFICATE OF STOCK:

(a)    The certificates representing shares of the Corporation's stock shall be in such form as shall be adopted by the Board of Directors, and shall be numbered and registered in the order issued. The

Sample provided by  quickinc

certificates shall bear the following: the Corporate Seal, the holder's name, the number of shares of stock and the signatures of either the President or the Secretary.

(b)     No certificate representing shares of stock shall be issued until the full amount of consideration therefore has been paid, except as otherwise permitted by law.

(c)     To the extent permitted by law, the Board of Directors may authorize the issuance of certificates for fractions of a share of stock which shall entitle the holder to exercise voting rights, receive dividends and participate in liquidating distributions, in proportion to the fractional holdings; or it may authorize the payment in cash of the fair value of fractions of a share of stock as of the time when those entitled to receive such fractions are determined; or it may authorize the issuance, subject to such conditions as may be permitted by law, of scrip in registered or bearer form over the signature of an officer or agent of the Corporation, exchangeable as therein provided for full shares of stock, but such scrip shall not entitle the holder to any rights of a stockholder, except as therein provided.

## SECTION 2 - LOST OR DESTROYED CERTIFICATES:

The holder of any certificate representing shares of stock of the Corporation shall immediately notify the Corporation of any loss or destruction of the certificate representing the same. The Corporation may issue a new certificate in the place of any certificate theretofore issued by it, alleged to have been lost or destroyed. On production of such evidence of loss or destruction as the Board of Directors in its discretion may require, the Board of Directors may, it its discretion, require the owner of the lost or destroyed certificate, or his legal representatives, to give the Corporation a bond in such sum as the Board may direct, and with such surety or sureties as may be satisfactory to the Board, to indemnify the Corporation against any claims, loss, liability or damage it may suffer on account of the issuance of the new certificate. A new certificate may be issued without requiring any such evidence or bond when, in the judgment of the Board of Directors, it is proper to do so.

## SECTION 3 - TRANSFER OF SHARES:

(a)     Transfer of shares of stock of the Corporation shall be made on the stock ledger of the Corporation only by the holder of record thereof, in person or by his duly authorized attorney, upon surrender for cancellation of the certificate or certificates representing such shares of stock with an assignment or power of transfer endorsed thereon or delivered therewith, duly executed, with such proof of the authenticity of the signature and of authority to transfer and of payment of taxes as the Corporation or its agents may require.

(b)     The Corporation shall be entitled to treat the holder of record of any share or shares of stock as the absolute owner thereof for all purposes and accordingly, shall not be bound to recognize any legal, equitable or other claim to, or interest in, such share or shares of stock on the part of any other

Sample provided by **quickinc**

person, whether or not it shall have express or other notice thereof, except as otherwise expressly provided by law.

## SECTION 4 - RECORD DATE:

In lieu of closing the stock ledger of the Corporation, the Board of Directors may fix, in advance, a date not exceeding sixty (60) days, nor less than ten (10) days, as the record date for the determination of stockholders entitled to receive notice of, or to vote at, any meeting of stockholders, or to consent to any proposal without a meting, or for the purpose of determining stockholders entitled to receive payment of any dividends or allotment of any rights, or for the purpose of any other action. If no record date is fixed, the record date for the determination of stockholders entitled to notice of, or to vote at, a meeting of stockholders shall be at the close of business on the day next preceding the day on which the notice is given, or, if no notice is given, the day preceding the day on which the meeting is held. The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the resolution of the directors relating thereto is adopted. When a determination of stockholders of record entitled to notice of, or to vote at, any meeting of stockholders has been made, as provided for herein, such determination shall apply to any adjournment thereof, unless the directors fix a new record date for the adjourned meeting.

## ARTICLE VI - DIVIDENDS

Subject to applicable law, dividends may be declared an paid out of any funds available therefor, as often, in such amount, and at such time or times as the Board of Directors may determine.

## ARTICLE VII - FISCAL YEAR

The fiscal year of the Corporation shall be 1 January to 31 December, and may be changed by the board of Directors from time to time subject to applicable law.

## ARTICLE VIII - CORPORATE SEAL

The corporate seal shall be in such form as shall be approved from time to time by the Board of Directors, whether a Seal is required by state law or not.

Sample provided by  *quickinc*

## ARTICLE IX – INDEMNITY

(a)     Any person made a party to any action, suit or proceeding, by reason of the fact that he, his testator or interstate representative is or was a director, officer or employee of the Corporation or of any corporation in which he served as such at the request of the Corporation shall be indemnified by the Corporation against the reasonable expenses, including attorneys' fees, actually and necessarily incurred by him in connection with the defense of such action, suit or proceedings, or in connection with any appeal therein, except in relation to matters as to which it shall be adjudged in such action, suit or proceeding or in connection with any appeal therein that such officer director or employee is liable for gross negligence or misconduct in the performance of his duties.

(b)     The foregoing right of indemnification shall not be deemed exclusive of any other rights to which any officer or director or employee may be entitled apart from the provisions of this section.

(c)     The amount of indemnity to which any officer or any director may be entitled shall be fixed by the Board of Directors, except that in any case in which there is no disinterested majority of the Board available, the amount shall be fixed by arbitration pursuant to the then existing rules of the American Arbitration Association.

## ARTICLE X - AMENDMENTS

### SECTION 1 - BY STOCKHOLDERS:

All bylaws of the Corporation shall be subject to alteration or repeal, and new bylaws may be made, by the affirmative vote of stockholders holding of record in the aggregate at least a majority of the outstanding shares of stock entitled to vote in the election of directors at any annual or special meeting of stockholders, provided that the notice or waiver of notice of such meeting shall have summarized or set forth in full therein, the proposed amendment.

### SECTION 2 - BY DIRECTORS:

The Board of Directors shall have power to make, adopt, alter, amend and repeal, from time to time, bylaws of the Corporation, provided, however, that the stockholders entitled to vote with respect thereto as in this Article X above-provided may alter, amend or repeal bylaws made by the Board of Directors, except that the Board of Directors shall have no power to change the quorum for meetings of stockholders or of the Board of Directors or to change any provisions of the bylaws with respect to the removal of directors of the filling of vacancies in the board resulting from the removal by the stockholders. If any bylaw regulating an impending election of directors is adopted, amended or repealed by the Board of Directors, there shall be set forth in the notice of the next meeting of

Sample provided by **quickinc**

stockholders for the election of Directors, the bylaws so adopted, amended or repealed, together with a concise statement of the changes made.

## CERTIFICATE OF PRESIDENT

THIS IS TO CERTIFY that I am the duly elected, qualified and acting President of this corporation and that the above and foregoing bylaws constituting a true original copy were duly adopted as the bylaws of said Corporation.

IN WITNESS WHEREOF, I have hereunto set my hand.

_____        5.25.2006
PRESIDENT                                DATE

Sample provided by  *quickinc*

12

**WAIVER OF NOTICE OF THE SPECIAL
MEETING OF DIRECTORS**

OF _Machine Project Inc_

The undersigned, being all of the directors of the above named corporation, consent that the special meeting be held at:

Date: _May 25, 2006_    Time: _8pm_

Place: _125 Buckingham Ave Trenton, NJ_

We waive further notice of the meeting.

_Mary E. Bromberg_

Date: _5-25-2006_

Sample provided by
**quickinc**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

KINSER CHIU and MACHINE PROJECT, INC.          :   INDEX NO. 08/601457
                                                   Bransten, J.

                             Plaintiffs,          :

              -against-          :          **AFFIDAVIT OF SERVICE**

                                       :

ANTHONY LUCAS and PAN AM SYSTEMS, INC.          :
and PAN AMERICA WORLD AIRWAYS, INC.,

                                       :

                        Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

STATE OF NEW YORK          )
                       ss.:
COUNTY OF NEW YORK  )

        I, **Marc E. Saget**, being duly sworn, hereby depose and say:

        I am over the age of eighteen years, am not a party to this action, and reside in the

State of New York, County of Kings.

        On May 19, 2008 at approximately 12:30 p.m., I served one (1) true copy of the

**NOTICE OF REMOVAL TO FEDERAL COURT** to Plaintiffs' counsel, RAYMOND W.M.

CHIN, ESQ, located at 305 Broadway, Suite 305, New York, New York, by personally

delivering same to W. Chin, receptionist.

                                              **MARC SAGET**

Sworn to before me this
19th day of May 2008

      Notary Public

ALAN WALZ
Notary Public, State of New York
No. 01WA4836662
Qualified in Queens County
Certificate Filed in New York County
Commission Expires May 31, 2011